UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                                    Chapter 11

r4 VASCULAR, INC.,                              Case No.  13-12409 (SCC)
                              Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER: (I) APPROVING SALE BY DEBTOR OF CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES PURSUANT TO SECTIONS 105(a), 363(b), (f) AND (m) AND 365 OF THE BANKRUPTCY CODE; (II) ASSUMING AND ASSIGNING CERTAIN  EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

Upon the motion, dated July 30, 2013 (the "Motion") of r4 Vascular, Inc. (the "Debtor"), as debtor and debtor in possession for, among other things, entry of an order pursuant to 11 U.S.C. §§ 105(a), 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (the "Sale Order") (i) authorizing the Debtor's sale (the "Sale") of substantially all  of the Debtor's assets (the "Assets") as described in that certain Asset Purchase Agreement dated as of July 25, 2013, a copy of which is annexed hereto as **Exhibit A**,[1] including all of the Schedules and Exhibits thereto (as they may be amended, in accordance with the terms thereof, the "Purchase Agreement"), among the Debtor, as seller, and White Sand Beach, LLC the purchaser (the "Purchaser"), free and clear of all liens, claims, encumbrances, and interests (hereinafter defined collectively as the "Interests"), with such Interests to transfer, affix, and attach to the proceeds of the Sale, all as more fully set forth herein; (ii) approving the Purchase Agreement; (iii) authorizing the assumption, assignment, and sale of certain executory contracts and unexpired leases (the "Included Contracts") pursuant to and as provided for in the Purchase Agreement; and (iv) fixing all amounts, if any, required to be paid or escrowed pending resolution of disputes

---

[1]  Capitalized terms not defined herein shall have the meanings set forth in the Purchase Agreement.

concerning such amounts in connection with the assumption of the Included Contracts pursuant to 11 U.S.C. § 365(b)(1)(A) and (B) (the "Cure Amounts"); and the Court having held a hearing on August 29, 2013 and thereafter entered an Order dated August 29, 2013 (the "Bid Procedures Order"), authorizing the Debtor to conduct an auction pertaining to and approving the terms and conditions for the Sale of the Assets and the assumption and assignment of the Included Contracts, and for the Debtor to consider higher or otherwise better offers for the Assets and the Included Contracts (the "Auction"); and a hearing on the Motion having been held on October 1, 2013 (the "Sale Hearing"); and no competing qualified bids having been submitted, and Purchaser having submitted the highest and best bid for the Assets and the Included Contracts; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors and all parties in interest; and upon the record of the Sale Hearing held in conjunction therewith; and after due deliberation; and good cause appearing therefor, the Court hereby

**FINDS, DETERMINES, AND CONCLUDES THAT**:

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. P. 9014.

B.      To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      The Court has jurisdiction over the Motion and the transactions contemplated by the Purchase Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter

is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N). Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

      D.    The statutory predicates for the relief sought in the Motion are sections 105, 363, and 365 of 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code"), and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014.

      E.    As evidenced by the affidavits of service previously filed with the Court, (i) proper, timely, adequate, and sufficient notice of the Motion, the Auction, the Bid Procedures Order, the Sale Hearing, the Sale and the assumption and assignment of the Included Contracts has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Fed. R. Bankr. P. 2002, 6004, and 9014, the Bid Procedures Order and the Purchase Agreement; (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Auction, the Bid Procedures Order, the Sale Hearing, the Sale, or the assumption and assignment of the Included Contracts is or shall be required.

      F.    As evidenced by the affidavits of publication previously filed with the Court, proper, timely, adequate and sufficient publication of the Notice of Auction, as attached to the Bid Procedures Order was made through publication of the Notice of Auction on September 9, 2013 in the national edition of USA Today and in Crain's New York Business.

      G.    As evidenced by affidavits previously filed with the Court, in the twelve to eighteen month period prior to the Petition Date, the Debtor extensively marketed the Assets to numerous parties directly and through its former investment banker, Gravitas Healthcare LLC.

      H.    The Debtor (i) has full power and authority to execute the Purchase Agreement and all other documents contemplated thereby, (ii) has all of the power and authority

necessary to consummate the transactions contemplated by the Purchase Agreement; and (iii) has taken all company action necessary to authorize and approve the Purchase Agreement and the consummation by the Debtor of the transactions contemplated thereby.

I.      No consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Debtor to consummate the transactions contemplated herewith.

J.      Emergent circumstances and sound business reasons exist for the Debtor's Sale of the Assets and the assumption and assignment of the Included Contracts under the Purchase Agreement.  Entry into the Purchase Agreement and consummation of the transactions contemplated thereby constitute the exercise by the Debtor of sound business judgment, and such acts are in the best interests of the Debtor, its estate, its creditors and all parties in interest. The Court finds that the Debtor has articulated good and sufficient business reasons justifying the Sale of the Assets under sections 105 and 363 of the Bankruptcy Code. Such business reasons include, but are not limited to, the following: (i) there is substantial risk of deterioration of the value of the Assets if the Sale is not consummated quickly; (ii) the Purchase Agreement constitutes the highest and best offer for the Assets and the Included Contracts; and (iii) the Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the Assets on a going-concern basis, and avoid decline and devaluation of the Debtor's business.

K.      The Purchase Agreement and the transactions contemplated thereby were negotiated, and have been and are being undertaken by the Debtor and Purchaser, at arms' length and without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code.  The Auction was conducted in accordance with the Bid Procedures Order,

and this Court concluded at the hearing on the Motion that the Purchaser submitted the highest and best bid for the Assets and the Included Contracts.

L.    The Purchase Agreement was negotiated, proposed and entered into by the Debtor and the Purchaser without collusion, in good faith, and at arms' length bargaining positions.  Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.

M.    The consideration provided by the Purchaser for the Assets is the highest and otherwise best offer received by the Debtor and is fair and reasonable. A sale of the Assets, other than one free and clear of Interests, would impact materially and adversely on the Debtor's estate, and would yield substantially less value for the Debtor's estate, with less certainty than the Sale.  Therefore, the Sale is in the best interests of the Debtor, its estate, creditors and all parties in interest.

N.    A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including: (i) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"); (ii) the Purchaser; (iii) all entities that may have an interest in a transaction with respect to the Assets; (iv) all entities known to have asserted any Interests in, upon or against the Assets or the Debtor; and (v) all parties having filed a notice of appearance in this Case.

O.    The Purchaser is not an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

P.    The transfer of the Assets to the Purchaser will be a legal, valid, and effective transfer of the Assets, and will vest the Purchaser with all right, title, and interest of the

Debtor to the Assets free and clear of all Interests including, but not limited to, claims otherwise arising under doctrines of successor liability.

Q.    The Purchaser would not have entered into the Purchase Agreement, and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate and creditors, if the sale of the Assets to the Purchaser and the assignment of the Included Contracts to the Purchaser was not free and clear of all Interests of any kind or nature whatsoever other than liabilities expressly assumed under the Purchase Agreement, or if the Purchaser would, or in the future could, be liable for any of such Interests including, without limitation, the Excluded Liabilities.

R.    The Debtor may sell the Assets free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those (i) holders of Interests; and (ii) non-debtor parties to Included Contracts which did not object, or which withdrew their objections to the Sale or the Motion are deemed to have consented under section 363(f)(2) of the Bankruptcy Code. Those (i) holders of Interests; and (ii) non-debtor parties to Included Contracts that did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code, and are adequately protected by having their Interests, if any, attach to the cash proceeds of the Sale ultimately attributable to the property against or in which they assert an Interest.

S.    The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Included Contracts to the Purchaser in connection with the consummation of the Sale, and that the assumption and assignment of the Included Contracts is in the best interests of the Debtor, its estate, its creditors and all parties in interest. The Included

Contracts being assigned to, and the Assumed Liabilities being assumed by, the Purchaser, are an integral part of Assets being purchased by the Purchaser and, accordingly, such assumption and assignment of Included Contracts and the Assumed Liabilities are reasonable, enhance the value of the Debtor's estate, and do not constitute unfair discrimination.

T.    The Purchaser has (i) cured, or has provided adequate assurance of cure, of any default existing prior to the Closing under any of the Included Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code (which does not involve an unexpired lease of real property); and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Included Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. The Purchaser has provided adequate assurance of its future performance of and under the Included Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.

U.    Approval of the Purchase Agreement and assumption and assignment of the Included Contracts and consummation of the sale of the Assets, at this time are in the best interests of the Debtor, its creditors, its estate and all parties in interest.

For all of the foregoing and after due deliberation, the Court **ORDERS, ADJUDGES, AND DECREES THAT:**

## **GENERAL PROVISIONS**

1.    The Motion is granted, as further described herein.

2.    No objections to the Motion were filed.  All responses concerning the Motion are resolved in accordance with the terms of this Order and as set forth in the record of the Hearing.

## <u>APPROVAL OF THE PURCHASE AGREEMENT</u>

3.      The Purchase Agreement, and all of the terms and conditions thereof, is approved.

4.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized and directed to perform its obligations under, and comply with the terms of, the Purchase Agreement and consummate the Sale pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

5.      The Debtor is authorized and directed to execute and deliver, and empowered to perform under, consummate and implement, the Purchase Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and to take all further actions as may be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring the Assets to the Purchaser or reducing the Assets to their possession, all as may reasonably be necessary or appropriate to the performance the Debtor's obligations as contemplated by the Purchase Agreement.

6.      This Order and the Purchase Agreement shall be binding in all respects upon all creditors (whether known or unknown) of the Debtor, all governmental entities, all non-debtor parties to the Included Contracts, all successors and assigns of the Purchaser, the Debtor and their affiliates and subsidiaries, the Assets, and any subsequent trustee appointed in the Debtor's chapter 11 case or upon a conversion of the Debtor's case to chapter 7, and shall not be subject to rejection. Nothing contained in any chapter 11 plan confirmed in this bankruptcy case or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the Purchase Agreement or this Sale Order.

**TRANSFER OF ASSETS**

7.      Except as expressly permitted or otherwise specifically provided for in the Purchase Agreement or this Sale Order, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Assets shall be transferred to the Purchaser, and upon Closing shall be free and clear of all Interests of any kind or nature whatsoever with all such Interests of any kind or nature whatsoever to attach to the net proceeds of the Sale in the order of their priority, with the same validity, force and effect, which they now have as against the Assets, subject to any claims and defenses the Debtor may possess with respect thereto.

8.      The transfer of the Assets to the Purchaser under the Purchase Agreement constitutes a legal, valid, and effective transfer of the Assets, and shall vest the Purchaser with all right, title, and interest of the Debtor in and to the Assets free and clear of all Interests of any kind or nature whatsoever.

9.      If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Interests in the Assets, shall not have delivered to the Debtor prior to the Closing in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction or releases of all interests that the person or entity has with respect to the Assets, then the Purchaser is authorized on or after Closing, to file, register or otherwise record a certified copy of this Sale Order which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests in the Assets of any kind or nature whatsoever subject to paragraph 7 hereof.

### ASSUMPTION, ASSIGNMENT, AND SALE TO
### PURCHASER OF INCLUDED CONTRACTS

10.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Debtor's assumption, assignment and sale to the Purchaser, and the Purchaser's assumption on the terms set forth in the Purchase Agreement of the Included Contracts identified on **Exhibit B** attached hereto, is approved and the requirements of section 365(b)(i) of the Bankruptcy Code with respect thereto are deemed satisfied. In accordance with the terms of the Purchase Agreement and all other applicable provisions of the Bankruptcy Code, the Debtor and the Purchaser retain the right to modify **Exhibit B** to add or delete executory contracts or unexpired leases or otherwise amend such exhibit at any time prior to Closing.

11.     The Debtor is authorized and directed in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code, to (i) assume and assign to the Purchaser, conditioned and effective upon the Closing of the Sale, the Included Contracts free and clear of all Interests of any kind or nature whatsoever; and (ii) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Included Contracts and Assumed Liabilities to the Purchaser.

12.     With respect to the Included Contracts: (i) each Included Contract is an executory contract or unexpired lease of the Debtor under section 365 of the Bankruptcy Code; (ii) the Debtor may assume each Included Contract under section 365 of the Bankruptcy Code; (iii) the Debtor may assign each Included Contract under sections 363 and 365 of the Bankruptcy Code, and any provisions in any Included Contract that prohibits or conditions the assignment of such Included Contract or allows the non-debtor party to such Included Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition

upon the assignment of such Included Contract, constitutes unenforceable anti-assignment provisions that are void and of no force and effect; (iv) the Included Contracts shall be transferred and assigned to and following the Closing of the Sale shall remain in full force and effect for the benefit of the Purchaser in accordance with their respective terms, notwithstanding any provisions in any such Included Contracts (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code), that prohibit, restrict or condition such assignment or transfer; (v) the Debtor is a party to each of the Included Contracts (including by reason of a prior acquisition of the original party to such Included Contracts) and has the legal authority to convey all of the Debtor's rights in such Included Contracts to the Purchaser; (vi) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to Purchaser of each Included Contract has been satisfied; and (vii) upon Closing and in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title and interest of each Included Contract.

13.    Pursuant to the Bid Procedures Order, parties to the Included Contracts were directed to file claims for alleged Cure Amounts due no later than September 26, 2013.  No parties filed claims for alleged Cure Amounts. The Cure Amounts set forth on **<u>Exhibit B</u>** are the true, correct, final and fixed amounts, and are the only amounts that are required to be paid upon assumption of the Included Contracts under sections 365(b)(1)(A) and (B) of the Bankruptcy Code. The Purchaser is authorized and directed to pay such amounts under sections 105, 363(b), and 365 of the Bankruptcy Code and the terms of the Purchase Agreement (including, without limitation, section 2.2(c)). The Cure Amounts shall not be subject to further dispute or audit

including any based on performance prior to the time of assumption, assignment, and sale, irrespective of whether such Included Contract contains an audit clause.

14.    Purchaser has demonstrated adequate assurance of future performance with respect to the Included Contracts that has satisfied the requirements of the Bankruptcy Code including, without limitation, sections 365(b)(1) and (3) and 365(f)(2)(B) to the extent applicable.

15.    There shall be no accelerations, penalties, assignment fees, increases or any other fees charged to Purchaser as a result of the assumption, assignment and sale of the Included Contracts. The validity of the assumption, assignment and sale to Purchaser shall not be affected by any dispute between the Debtor or its affiliates and another party to an Included Contract regarding the payment of any amount, including any cure amount under the Bankruptcy Code.  The Included Contracts, upon assignment to Purchaser, shall be deemed valid and binding, in full force and effect and in accordance with their respective terms.

16.    Any party that may have had the right to consent to the assignment of its Included Contract is deemed to have consented to such assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code and otherwise if such party failed to object to the assumption and assignment.

17.    Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, except as provided in this Sale Order, all parties to the Included Contracts are forever barred and enjoined from raising or asserting against Purchaser any assignment fee, default, breach, claim, or pecuniary loss, or condition to assignment, arising under or related to the Included Contracts existing as of the Closing under the Purchase Agreement or arising by reason of the Closing under the Purchase Agreement. Except as provided in the Purchase Agreement or this Sale

Order, after the Closing the Debtor and its estate shall have no further liabilities or obligations with respect to any Assumed Liabilities, and all holders of such claims are forever barred and estopped from asserting such claims against the Debtor, its successors or assigns, its property or its assets or estates.

## PAYMENT TO SECURED LENDER

18.    Purchaser holds an undisputed, liquidated and non-contingent secured claim against the Debtor secured by the Assets in the allowed amount of $8,956,502. Purchaser's consideration for the Assets was (i) a credit bid in the amount of $6,000,000, (ii) cash in the amount of $125,000 and (iii) a waiver of its deficiency claim. The transfer of the Assets and Included Contracts to the Purchaser shall constitute payment in full on account of Purchaser's secured claims against the Debtor.

## ADDITIONAL PROVISIONS

19.    The consideration provided by the Purchaser for the Assets under the Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the auction sale and sale price was not controlled by an agreement among potential bidders at the auction sale, and may not be avoided under section 363(n) of the Bankruptcy Code.

20.    On the Closing of the Sale, all parties are authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release their Interests in the Assets, if any, as such Interests may have been recorded or may otherwise exist.

21.    Except as otherwise expressly provided in the Purchase Agreement, Purchaser shall have no obligation to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to

any and all pension plans) or any other payment to employees of the Debtor. Except as provided

in the Purchase Agreement, Purchaser shall have no liability with respect to any collective

bargaining agreement, employee pension plan, employee welfare or retention, benefit and/or

incentive plan to which the Debtor is or was a party and that relates to the Assets (including,

without limitation, arising from or related to the rejection or other termination of any such

agreement), and Purchaser shall in no way be deemed to be party to or assignee of any such

agreements, and no employee of Purchaser shall be deemed in any way to be covered by or a

party to any such agreement, and all parties to any such agreements are enjoined from asserting

against Purchaser any and all claims arising from or relating to such agreements.

22.    Each and every federal, state, and local governmental agency or

department is directed to accept any and all documents and instruments necessary and

appropriate to consummate the transactions contemplated by the Purchase Agreement.

23.    All entities that are presently, or on the Closing may be, in possession of

any or all of the Assets are directed to surrender possession of the Assets to the Purchaser on the

Closing.

24.    Except for the Assumed Liabilities or as expressly permitted or otherwise

specifically provided for in the Purchase Agreement or this Sale Order, the Purchaser shall have

no liability or responsibility for any liability or other obligation of the Debtor arising under or

related to the Assets other than for the Assumed Liabilities. Without limiting the generality of the

foregoing, and except as otherwise specifically provided herein and in the Purchase Agreement,

to the extent allowed by law, the Purchaser shall not be liable for any claims against the Debtor

or any of its predecessors or affiliates, and the Purchaser shall have no successor or vicarious

liabilities of any kind or character including, but not limited to, any such liability that may be

imposed by statute (e.g., under so-called "bulk-sale" laws) or any theory of antitrust, environmental, products liability, successor or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Assets prior to the Closing.

25.     Under no circumstances shall the Purchaser be deemed to be a successor of or to the Debtor for any Interest against or in the Debtor or the Assets of any kind or nature whatsoever. The sale, transfer, assignment and delivery of the Assets shall not be subject to any Interests, and Interests of any kind or nature whatsoever shall remain with and continue to be obligations of the Debtor. All Persons holding Interests against or in the Debtor or the Assets of any kind or nature whatsoever (including but not limited to, the Debtor and/or its respective successors, including any trustee's thereof, creditors, employees, unions, former employees and shareholders, administrative agencies, governmental units, secretaries of state, federal, state and local officials, maintaining any authority relating to any environmental, health and safety laws, and their respective successors or assigns) shall be and are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Interests of any kind or nature whatsoever against the Purchaser, their property, their successors and assigns, or the Assets as an alleged successor or otherwise, with respect to any Interest of any kind or nature whatsoever such Person or entity had, has or may have against or in the Debtor, its estate, officers, directors, shareholders or the Assets. Except as expressly permitted or otherwise specifically provided in the Purchase Agreement or this Sale Order, following the Closing no

holder of an Interest in the Debtor shall interfere with the Purchaser's title to or use and enjoyment of the Assets based on or related to such Interest, or any actions that the Debtor may take in its chapter 11 case.

26.     Nothing in this Sale Order shall be construed to limit, in any fashion, the lawful regulatory and enforcement powers of the Federal Trade Commission.

27.     This Court retains jurisdiction to enforce and implement the terms and provisions of the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects including, but not limited to, retaining jurisdiction to (i) compel delivery of the Assets and the Included Contracts to the Purchaser; (ii) compel delivery of the purchase price or performance of other obligations owed to the Debtor; (iii) resolve any disputes arising under or related to the Purchase Agreement; (iv) interpret, implement and enforce the provisions of this Sale Order; (v) protect the Purchaser against (a) any of the Excluded Liabilities; or (b) any Interests in the Debtor or the Assets, of any kind or nature whatsoever, that are or will be attaching to the proceeds of the Sale; and (vi) resolve any disputes arising from the assumption, assignment and sale of the Included Contracts to the Purchaser; provided, however, that in the event the Court abstains from exercising or declines to exercise such jurisdiction or is without jurisdiction respecting the Purchase Agreement or this Sale Order, such abstention, refusal or lack of jurisdiction shall have no effect upon, and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter; provided, further, that nothing in this Sale Order shall contravene any provisions in the Purchase Agreement concerning the processes for dispute resolution.

28.     The transactions contemplated by the Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale of the Assets to the Purchaser (including the assumption, assignment and sale of any of the Included Contracts), unless such authorization is duly stayed pending such appeal. The Purchaser is a purchaser in good faith of the Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

29.     The terms and provisions of the Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of the Debtor, its estate, its creditors and all parties in interest, the Purchaser, and their respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting an Interest in the Assets to be sold to the Purchaser under the Purchase Agreement, notwithstanding any subsequent appointment of a trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code or, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.

30.     The provisions of this Sale Order and the terms and conditions of the Purchase Agreement shall be binding upon, fully enforceable against and inure to the benefit of any trustee, responsible officer or other fiduciary appointed in the Debtor's chapter 11 case under any section of the Bankruptcy Code or any applicable law. Such binding effect is an integral part of this Sale Order.

31.     The failure specifically to include any particular provisions of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such

provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety. Notwithstanding anything herein to the contrary, the Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

32.    The stay of orders authorizing the (i) use, sale, or lease of property as provided for in Fed. R. Bank. P. 6004(g); and (ii) assignment of an executory contract or unexpired lease as provided for in Fed. R. Bank. P. 6006(d), shall not apply to this Sale Order, and this Sale Order is immediately effective and enforceable.

33.    The Court, in entering this Order, makes the above findings of fact and conclusions of law that the Debtor's use of Cash Collateral as set forth herein complies with the Debtor's fiduciary obligations to the estate.

Dated: October 2, 2013
New York, New York

*/s/ Shelley C. Chapman*
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT "A"
## (ASSET PURCHASE AGREEMENT)

ASSET PURCHASE AGREEMENT

DATED AS OF

JULY 25, 2013

BY AND BETWEEN

R4 VASCULAR, INC., AND

WHITE SAND BEACH LLC

{00632549.DOC;4 }

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made as of July 25, 2013 by and among R4 Vascular, Inc., a Delaware corporation with an address at 1270 Avenue of the Americas, Ste 302, New York, NY 10020, ("Seller" or the "Company") and White Sand Beach, LLC, a Delaware limited liability company with an address at c/o Robinson Brog Leinwand Greene Genovese & Gluck P.C. 875 Third Avenue New York, NY 10022 ("Buyer").

## RECITALS

WHEREAS, Seller has filed a voluntary petition (the "Bankruptcy Petition") for relief under Chapter 11 of the United States Code, 11 U.S.C. Sections 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Court") bearing case No. Case No. 13-12409 (SCC); and

WHEREAS, subject to the approval of the Court, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Assets (as hereinafter defined), excluding the Excluded Assets (as hereinafter defined), all upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, in connection with the transactions contemplated hereby, Buyer may designate prior to Closing, one or more of its Affiliates to purchase the Acquired Assets and to assume the Assumed Liabilities pursuant to Section 11.07.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and intending to be legally bound, the Parties agree as follows.

## ARTICLE 1
## DEFINITIONS

SECTION 1.01          Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"Acquired Assets" has the meaning set forth in Section 2.01.

"Agreement" has the meaning set forth in the preamble.

{00632549.DOC;4 }                              1

"Allocation" has the meaning set forth in <u>Section 2.07</u>.

"Assigned Contracts" means the Contracts described in <u>Section 1.01</u>of the Seller's Disclosure Schedule, as such section may be amended pursuant to <u>Section 2.02(b)(i)</u>. Notwithstanding anything herein to the contrary, "Assigned Contracts" shall not include any Contracts that are Excluded Assets.

"Assignment of Copyrights" has the meaning set forth in <u>Section 3.03(c)</u>, and shall be in substantially the form attached hereto as **Exhibit A**.

"Assignment of Domain Names" has the meaning set forth in <u>Section 3.03(c)</u>, and shall be in substantially the form attached hereto as **Exhibit B**.

"Assignment of Patents" has the meaning set forth in <u>Section 3.03(c)</u>, and shall be in substantially the form attached hereto as **Exhibit C**.

"Assignment of Trademarks" has the meaning set forth in <u>Section 3.03(c)</u>, and shall be in substantially the form attached hereto as **Exhibit D**.

"Assumed Liabilities" has the meaning set forth in <u>Section 2.03</u>.

"Assumption Agreement" has the meaning set forth in <u>Section 2.03</u>, and shall be in substantially the form attached hereto as **Exhibit E**.

"Auction" has the meaning set forth in the Bid Procedures.

"Avoidance Actions" means any and all claims for relief of Sellers under chapter 5 of the Bankruptcy Code.

"Bid Procedures" means the bid procedures attached as an exhibit to the Bid Procedures Order, as the same may be entered by the Bankruptcy Court and shall have become a Final Order, and which Bid Procedures (as they may be amended, modified, supplemented from time to time) shall be in form and substance acceptable to Buyer.

"Bid Procedures Order" means an Order of the Bankruptcy Court, which Order (including exhibits) shall be in substantially the form attached hereto as **Exhibit F**, and which Order, as it may be amended, modified, supplemented from time to time, shall be in form and substance acceptable to Buyer.

"Bill of Sale" means a bill of sale which shall be in substantially the form attached hereto as **Exhibit G**.

"Break-up Fee and Expense Reimbursement" has the meaning set forth in <u>Section 6.03</u>.

"Business" has the meaning set forth in the recitals.

{00632549.DOC;4 }                                2

"Business Day" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized to close.

"Business Trade Secrets" has the meaning set forth in Section 4.16(f).

"Buyer" has the meaning set forth in the preamble.

"Buyer Termination Notice" has the meaning set forth in Section 10.01(b)(i).

"Cash Consideration" $25,000, shall be held by counsel to the Seller, subject to application to the Bankruptcy Court to pay the legal fees and expenses including United States Trustee Fess incurred by the estate in obtaining Court approval of this Agreement plus $100,000 to be paid to the Seller to be distributed pursuant to its plan of reorganization.

"Chapter 11 Case" has the meaning set forth in the recitals.

"Closing" has the meaning set forth in Article 3.

"Closing Date" means the date and time as of which the Closing occurs as set forth in Section 3.01.

"Consent" means any consent, waiver, approval, Order or authorization of, or registration, declaration or filing with or notice to, any Governmental Authority or other Person.

"Consent Pending Contract" has the meaning set forth in Section 6.04(c).

"Contract" means any agreement, contract, obligation, understanding, or undertaking (whether written or oral) or any other instrument that is legally binding.

"Contract Retention Period" has the meaning set forth in Section 6.04(d).

"Copyrights" means all United States and foreign copyrights and copyrightable subject matter (including, but not limited to, Software), whether registered or unregistered, including all United States copyright registrations and applications for registration and foreign equivalents, all moral rights, all common-law copyright rights, and all rights to register and obtain renewals, extensions, restorations and reversions of copyright registrations, together with all other copyright rights accruing by reason of any international copyright convention.

"Cure Costs" means, for any given Assigned Contract the amounts required to cure any defaults arising under such Assigned Contract, as applicable, including for any pecuniary losses arising from such defaults, and all contingent, unliquidated or unmatured liabilities under such Assigned Contracts, as applicable, as

may be required to be paid upon the assumption and assignment of such Assigned Contract, as applicable pursuant to section 365(b) of the Bankruptcy Code.

"Current Accounts Receivable" means the aggregate amount of all Receivables (other than any intercompany receivables) that are less than 90 days outstanding from the date of invoice.

"Data" means all information and data, whether in printed or electronic form and whether contained in a database or otherwise.

"Deeds" means the deeds transferring title to the Owned Real Property to be delivered pursuant to Section 3.03(a).

"Determined Cure Costs" means, in the aggregate, all Cure Costs payable to counterparties of Assigned Contracts as such amounts are determined pursuant to a Final Order of the Bankruptcy Court, which may be the Sale Order (as it shall have become a Final Order).

"DIP Financing Payoff Amount" means the amount of cash necessary to pay the Indebtedness outstanding under the DIP Note at the time of Closing, in full, including all outstanding principal, accrued and unpaid interest, fees, expenses or other amounts owing thereunder, in each case as of the Closing Date.

"DIP financing stipulation" means the stipulation dated as the date hereof which sets forth the terms and conditions whereby the Buyer will permit the Seller to use its money to continue its bussiness operations.

"DIP Lender" means White Sand Beach LLC.

"Domain Names" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet. A Domain Name may or may not also be a Trademark.

"Encumbrance" means any charge, lien, claim, mortgage, lease, hypothecation, deed of trust, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"Environmental, Health and Safety Laws" has the meaning set forth in Section 4.07(b).

"Environmental, Health and Safety Permits and Licenses" means any Consent required under any Environmental, Health and Safety Laws.

"Equipment" means all furniture, equipment, computers, machinery, apparatus, appliances, implements, spare parts, supplies and all other tangible personal property of every kind and description owned by the Seller.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estimated Cure Costs" has the meaning set forth in Section 6.05(b).

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"Final Order" means an action taken or Order issued by the applicable Governmental Authority as to which: (i) no request for stay of the Proceeding or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the Proceeding or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the Proceeding or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the Proceeding or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Finished Goods Inventory" means all inventory of the Seller available for sale in the ordinary course of business.

"GAAP" means United States generally accepted accounting principles.

"Governmental Authority" means any United States federal, state or local, or any foreign (federal, state, provincial, local or otherwise) government, governmental authority, regulatory or administrative authority or any court, tribunal or judicial body having jurisdiction, or any quasi-governmental or private body exercising any regulatory, governmental or quasi-governmental authority, or any self-regulatory organization.

"Hazardous Substance" means any "pollutant", "contaminant", "solid waste", "hazardous waste", "hazardous material" or "hazardous substance" under any Environmental, Health and Safety Laws.

"Indebtedness" of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under

any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the ordinary course of the business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property" means all of the following and similar intangible property and related proprietary rights, interests and protections, however arising, pursuant to the Laws of any jurisdiction throughout the world:  (a) trademarks, service marks, trade names, brand names, logos, trade dress and other proprietary indicia of goods and services, whether registered, unregistered or arising by Law, and all registrations and applications for registration of such trademarks, including intent-to-use applications, and all issuances, extensions and renewals of such registrations and applications; (b) internet domain names, whether or not trademarks, registered in any generic top level domain by any authorized private registrar or Governmental Authority; (c) original works of authorship in any medium of expression, whether or not published, all copyrights (whether registered, unregistered or arising by Law), all registrations and applications for registration of such copyrights, and all issuances, extensions and renewals of such registrations and applications; (d) confidential information, formulas, designs, devices, technology, know-how, research and development, inventions, methods, processes, compositions and other trade secrets, whether or not patentable; and (e) patented and patentable designs and inventions, all design, plant and utility patents, letters patent, utility models, pending patent applications and provisional applications and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations and renewals of such patents and applications.

"Interim Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable Law), together with all extensions, modifications and amendments thereto, authorizing, on an interim basis, Seller to execute and perform under the terms of the DIP financing stipulation.

"Inventory" means all inventory and all finished goods, merchandise, work in progress, residual by-products, samples, supplies, spare parts, shipping materials, packaging materials, raw materials and other consumables relating to the Business and maintained, held or stored by or for the Seller as of the Closing Date, wherever located, and any prepaid deposits for any of the same.

"IRC" means the Internal Revenue Code of 1986, as amended, and regulations issued by the IRS pursuant to the Internal Revenue Code.

"IRS" means the Internal Revenue Service of the United States.

"IT Systems" means electronic data processing, information, recordkeeping, communications, telecommunications, networking, account management, inventory management and other such applications, Software, and hardware, equipment and services (including, but not limited to, all applications and Software installed on all hardware and equipment, and all databases, firmware, and related documentation), and Internet websites and related content.

"Law" means any federal, state, regional, local or foreign law, statute, ordinance, code, treaty, rule, regulation, Order, action or requirement of any Governmental Authority.

"Liability" means all liabilities and obligations (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due).

"License" has the meaning set forth in Section 4.16(b).

"Material Adverse Effect" means any fact, condition, change, violation, inaccuracy, circumstance, effect or event ("Effect"), individually or in the aggregate, (i) that has, or would reasonably be likely to have, a material adverse effect on the assets, liabilities, properties, results of operations or financial condition of the Business (excluding the Excluded Assets and the Excluded Liabilities), and the Acquired Assets and the Assumed Liabilities, taken as a whole, or (ii) has or would reasonably be likely to prevent, materially delay or materially impair the ability of the Sellers to perform their respective obligations hereunder or to consummate the transactions contemplated hereby ; provided, however, that "Material Adverse Effect" shall not include the following, nor shall any of the following be taken into account in determining whether there has been a Material Adverse Effect: (a) events or conditions that generally affect the industry in which the Seller; (b) general business or economic conditions; (c) national or international political or social conditions, including the engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any actual or threatened military or terrorist attack; (d) the conditions of any financial, banking, or securities markets; (e) changes in GAAP made after the date hereof; (f) acts or omissions of any Seller carried out (or omitted to be carried out) in accordance with this Agreement or upon the written consent of Buyer in accordance with this Agreement; or (g) any condition arising by reason of the commencement of the Chapter 11 Case; unless, in the case of clause (a), (b), (c), (d) or (e) above, such Effect would reasonably be expected to result in a materially disproportionate adverse effect on, or change in, the Acquired Assets, the Assumed Liabilities or the Business (other than the Excluded Assets and Excluded Liabilities), taken as a whole, relative to the businesses of other comparable companies in the industries in which the Business operates.

"Material Contract" means any of the following Contracts relating to, connected with or used in the Business, to which any Seller is a party, or by which any of the Acquired Assets or any of the assets and properties of the Seller are bound:

(i)    any limited liability company agreement, joint venture, partnership agreement, profit sharing arrangement or other similar agreement or arrangement relating to the formation, creation, operation, management or control of any partnership or joint venture with regard to which a Seller is a party;

(ii)    any Contract for the purchase or sale of goods, services, assets, properties, rights and claims resulting in expenses by the Seller in excess of $50,000;

(iii)    any Contract for the sale of goods, services, assets, properties, rights or claims resulting in revenue to the in excess of $50,000;

(iv)    any Contract relating to (A) any outstanding capital lease obligations requiring annual payments in excess of $50,000 or (B) conditional sale arrangements;

(v)    a loan, guarantee of Indebtedness or Contract relating to Indebtedness of the Seller, or pursuant to which the Seller has mortgaged, pledged or otherwise placed an Encumbrance on any portion of the properties or assets of the Seller;

(vi)    any Contract that requires the Seller to make a loan or capital contribution to or investment in any Person;

(vii)    any Benefit Plan;

(viii)    any Contract for the lease of tangible personal property;

(ix)    any Contract providing for the indemnification by a Seller;

(x)    any Contract which purports to limit the right of the Seller to engage freely or compete in any line of business or to compete with any Person or operate in any location;

(xi)    any Contract that relates to the development, ownership, licensing or use of Intellectual Property (other than a shrink wrap or similar license for generally available "off-the-shelf" software);

(xii)    a settlement or similar agreement with any Governmental Authority or Order or Consent of a Governmental Authority to which the Seller is subject involving future performance by the Seller which is material to the Seller, taken as a whole;

(xiii)    any other Contract that is material to the Seller.

"Order" means any award, writ, injunction, judgment, order, ruling, directive, stipulation, determination or decree entered, issued, made, or rendered by or with any Governmental Authority.

"Outside Date" means October 1, 2013.

"Patents" means United States and foreign patents (including certificates of invention and other patent equivalents), patent applications, provisional applications and patents issuing therefrom, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals, patent disclosures, discoveries, ideas, inventions (whether or not patentable or reduced to practice) or improvements thereto.

"Permitted Encumbrances" means (i) statutory liens for current property Taxes and assessments (A) not yet due and payable or (B) being contested in good faith by appropriate proceedings for which adequate reserves have been made in accordance with GAAP, including liens for *ad valorem* Taxes and statutory liens not yet due and payable arising other than by reason of any default by Sellers, (ii) easements, covenants, conditions, restrictions and other similar matters of record on real property, or leasehold estates that do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto, (iii) Encumbrances that constitute or secure Assumed Liabilities (including Encumbrances arising under the Assigned Contracts, (iv) Encumbrances, title exceptions or other imperfections of title caused by or resulting from the acts of Buyer or any of its Affiliates, employees, officers, directors, agents, contractors, invitees or licensees, (v) landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's, repairmen's liens or other like Encumbrances arising in the ordinary course of business with respect to amounts not yet overdue or amounts being contested in good faith by appropriate Proceedings, (vi) Laws now or hereafter in effect relating to the Real Property that are not violated by the current use and operation by the Seller of the Real Property and (vii) the other Encumbrances listed in Section 1.01(c) of the Seller's Disclosure Schedule.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or other entity or Governmental Authority.

"Petition Date" means July 24, 2013.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Purchase Price" has the meaning set forth in Section 2.05.

"Real Property" means, collectively, any owned real property, or leased real property.

"Registered" with respect to Intellectual Property, means issued, registered, renewed or the subject of a pending application.

"Release" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment (including the abandonment or discharging of barrels, containers and other closed receptacles containing any Hazardous Substance).

"Representative" means with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, financial advisors and restructuring advisors.

"Sale Hearing" has the meaning set forth in the Bid Procedures.

"Sale Order" means an Order of the Bankruptcy Court pursuant to sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving, inter alia, the sale of the Acquired Assets to the Buyer on the terms and conditions set forth herein, free and clear of all Encumbrances, and the assumption by the Seller, and assignment to Buyer, of the Assigned Contracts, and containing a finding that Buyer has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code, which Order, including exhibits, and as the same may be amended, modified, supplemented from time to time, shall be in form and substance acceptable to Buyer.

"Seller" has the meaning set forth in the preamble.

"Seller's Disclosure Schedule" means the Disclosure Schedule delivered by Sellers to Buyer on the date hereof in draft form attached hereto as **Exhibit H**, it being understood and agreed that the final form of the Seller's Disclosure Schedule shall be delivered by Sellers to Buyer in accordance with Section 7.05(a) hereof.

"Seller's Knowledge" means the actual knowledge of the persons listed in Section 1.01(d) of the Seller's Disclosure Schedule.

"Seller's Termination Notice" has the meaning set forth in Section 10.01(c).

"Software" means all computer software programs (whether in source code, object code or other form) and software systems (whether owned, licensed, or used), including all databases, compilations, tool sets, compilers, "proprietary" languages, related documentation, technical manuals and materials, and any license to use or other rights related to the foregoing.

"Successful Bid" has the meaning set forth in the Bid Procedures.

"Successful Bidder" has the meaning set forth in the Bid Procedures.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the IRC), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar taxes, duty, levy or other governmental charge or assessment or deficiencies thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any transferee Liability in respect of any items described in clause (i) above.

"Tax Return" means any return, declaration, report, claim for refund, information return, or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment, or collection of any Tax or the administration of any Tax Laws.

"Third Party Consents" means the Consents set forth in Section 1.01(e) of the Seller's Disclosure Schedule.

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, brand names, certification names, collective marks, trade dress and trade names (including all assumed or fictitious names), and any other indicia of source of goods and services, designs and logotypes related to the above, in any and all forms, whether registered or unregistered, and registrations and pending applications to register the foregoing (including intent to use applications), and all goodwill related to or symbolized by the foregoing.

"Trade Payables" means any and all trade payables of the Seller arising from the conduct of the Business, incurred by Seller prior to the Closing and that are not yet due and payable to such third parties on or prior to the Closing Date in accordance with the terms of the Contracts giving rise to such trade payables, in each case solely to the extent such trade payables are incurred in the ordinary course of business.

"Trade Secrets" means confidential and proprietary information and trade secrets and know-how, including, without limitation, processes, schematics, databases, formulae, prototypes, models, drawings and customer lists.

"Transaction Documents" means this Agreement and any other agreements, instruments, or documents entered into pursuant to this Agreement.

"Transfer" has the meaning set forth in Section 6.04(c).

"Transfer Taxes" has the meaning set forth in Section 7.07(b).

"Transition Services Agreement" means the transition services agreement by and among the Sellers and Buyer, which shall be in form and substance reasonably acceptable to Buyer.

SECTION 1.02    Other Definitions and Interpretive Matters.

(a)    For purposes of this Agreement, the following rules of interpretation shall apply, except to the extent otherwise expressly provided or the context otherwise requires:

(i)    when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day;

(ii)    any reference in this Agreement to $ shall mean U.S. dollars;

(iii)    all Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement;

(iv)    any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa;

(v)    the words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear; and

(vi)    the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    The parties hereto participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties

and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2
## PURCHASE AND SALE; PURCHASE PRICE

SECTION 2.01    Purchase and Sale of Acquired Assets.

Upon the terms, and subject to the conditions, of this Agreement, at Closing:

(a)        The Seller shall, sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase and acquire, free and clear of all Encumbrances (other than Permitted Encumbrances), all right, title and interest of the Seller in, to or under all of the properties, assets, rights and claims of the Seller (other than any Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used, useful or held for use in or relating to the Business (collectively, the "Acquired Assets"), including, but not limited to, the following:

(i)        all items relating the 1) Vector™ Percutaneous Transluminal Angioplasty (PTA) balloon catheter; and 2)  vascular access products including uncoated PICC lines, dialysis catheters, apheresis catheters, micro-access catheters, and drainage catheters; as well as PICC and dialysis catheters with a biomimetic coating;

(ii)        all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories of the  Company including any Inventory located at contract manufacturers;

(iii)        all items related to a valvuloplasty balloon catheter;

(iv)        all Intellectual Property assets;

(v)        all furniture, fixtures, equipment, machinery, tools, molds, office equipment, supplies, computers, telephones and other tangible personal property, whether in the Company's possession or located at third parties;

(vi)        all rights to any causes of actions of any nature available to or being pursued by the Company, whether arising by way of counterclaim or otherwise;

(vii)        all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of

recoupment, deposits, charges, sums and fees (other than any such item relating to the payment of Taxes);

(viii)    all of the Company's rights under warranties, indemnities and all similar rights against third parties to the extent related to the Assets;

(ix)    all insurance benefits, including rights and proceeds, arising from or relating to the Assets;

(x)    originals, or where not available, copies, of all books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, existing and prospective customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and intellectual property files relating to the Intellectual Property Assets and the Intellectual Property Licenses ("Books and Records");

(xi)    all FDA regulatory approvals or approvals to market (510ks);

(xii)    all marketing reports and analyses;

(xiii)    all pre-clinical and clinical research;

(xiv)    all intellectual property licenses.

(xv)    all software licenses for the Company's Quality and Regulatory system, together with any and all information of the Company in such systems;

(xvi)    all design history files, device master record and device history record documents, including specifications, drawings, technical data and other information regarding, but not limited to, research and development, inventions, designs, discoveries, developments, processes, manufacture, analytical and quality control records.

(xvii)    the Assigned Contracts; and

(xviii)    any tax refunds or tax credits which the Seller may have.

SECTION 2.02        Excluded Assets.

(a)        Notwithstanding anything in Section 2.01 to the contrary, nothing herein shall be deemed to sell, transfer, assign or convey the following assets to Buyer, and Sellers shall retain all of their respective rights, title and interests in, to and under, and Buyer shall have no rights with respect to, any of the following (collectively, the "Excluded Assets"):

(i)        any portion of the Purchase Price delivered (or required to be delivered) to Seller pursuant to this Agreement;

(ii)        any Contract or lease that is not an Assigned Contract, respectively (including, without limitation, any Contract that is excluded pursuant to Section 2.02(b)(i) or Section 6.05(c) hereof), and any rights or benefits thereunder;

(iii)        any rights, claims or causes of action of Sellers under this Agreement or any other Transaction Document;

(iv)        any Equity Interests in the Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other Equity Interests in the Seller;

(v)        any Benefit Plan;

(vi)        all cash currently on hand;  and

(vii)        rights or interest the Seller has to any Real Property.

(b)        At any time not later than fifteen (15) calendar days prior to the Sale Hearing, and subject to Section 6.05(c), Buyer, in its sole discretion by written notice to the Seller, may:

(i)        amend the Seller's Disclosure Schedule to exclude from being assigned any Contract, whereupon such Contract so excluded shall not constitute an "Assigned Contract", respectively (and shall therefore constitute an Excluded Asset), and Buyer shall not acquire any rights, or assume any Liabilities, with respect thereto.  Buyer acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to exclude from being assigned any Contracts pursuant to the preceding sentence.

SECTION 2.03    Assumed Liabilities

Upon the terms and subject to the conditions of this Agreement, at Closing, Buyer shall execute and deliver to Sellers an assumption agreement (the "Assumption Agreement") pursuant to which Buyer shall assume and agree to discharge,

when due (in accordance with their respective terms and subject to the respective conditions thereof), the following Liabilities (collectively the "Assumed Liabilities") and no others:

(a)    all Liabilities arising after the Closing Date solely in connection with the ownership, operation and use of the Acquired Assets or the operation of the Business from and after the Closing Date;

(b)    all Liabilities of the Seller under the Assigned Contracts, including all Determined Cure Costs (to be satisfied in accordance with Section 6.05(a)); and

(c)    all other Liabilities set forth in Section 2.03(c) of the Seller's Disclosure Schedule.

SECTION 2.04    Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume, and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of Sellers, and Sellers shall be solely and exclusively liable with respect thereto, other than the Assumed Liabilities (collectively the "Excluded Liabilities").  The Excluded Liabilities include, but are not limited to, the following:

(a)    other than as specifically set forth in Section 2.03, any Liability of Sellers or their Affiliates arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including all Liabilities for the expenses of Sellers or any of their Affiliates for the negotiation and preparation of this Agreement and expenses incurred in connection with its Chapter 11 Case;

(b)    other than as specifically set forth in Section 2.03, any Liability relating to events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Acquired Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(c)    other than as specifically set forth in Section 2.03, any Liability to any current or former employee, independent contractor, consultant or agent at any time employed or engaged by the Seller, or who otherwise provided services to the Seller, at any time, or to any such Person's spouse, children, other dependents or beneficiaries, with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such Person's employment by the Seller, whenever such claims mature or are asserted, including (except as otherwise specifically set forth herein), all Liabilities arising (i) under any employment, wage and hour restriction, equal opportunity, discrimination, plant closing or immigration and naturalization Laws, or (ii)

in connection with any workers' compensation or any other employee health, accident, disability or safety claims;

(d)      other than as specifically set forth in <u>Section 2.03</u>, any Liability for Taxes attributable to periods prior to the Closing Date;

(e)      any Liability incurred by the Seller or its respective directors, officers, stockholders, agents or employees (acting in such capacities) at any time;

(f)      any Liabilities of any of the Sellers not related to the operation of the Business;

(g)      any Liabilities for personal injury claims, product recalls or similar claims or actions relating to the operation of the Business prior to the Closing;

(h)      any Liability relating to or arising out of any violation of an applicable Law or Order prior to the Closing by the Sellers; and

(i)      any Liability relating to or arising out of the ownership or operation of an Excluded Asset; and

Nothing contained in this Agreement shall require the Buyer to pay or discharge any Assumed Liabilities (i) prior to such Assumed Liabilities becoming due and payable in accordance with (if applicable) the underlying terms of any Contracts giving rise to or governing such Assumed Liabilities or (ii) so long as the Buyer shall in good faith contest the amount or validity thereof.

SECTION 2.05    <u>Purchase Price</u>.  In addition to the assumption by Buyer at Closing of the Assumed Liabilities (including, among other things, the Determined Cure Costs) pursuant to <u>Section 2.03</u>, the purchase price (the "<u>Purchase Price</u>") for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Acquired Assets, shall be an amount equal to $6,125,000 consisting of:

(i)      the Cash Consideration; plus

(ii)      a credit bid pursuant to section 363(k) of the Bankruptcy Code consisting of $6,000,000 from Purchaser's secured claim against the Seller.

SECTION 2.06    <u>Payment of Purchase Price</u>.  On the terms and subject to the conditions set forth in this Agreement, at Closing, the Buyer shall pay to the Seller an amount in cash equal to the Purchase Price by wire transfer of immediately available funds to the accounts designated in writing by the Seller on the Closing Date.

SECTION 2.07    <u>Allocation of Purchase Price</u>.

The Purchase Price shall be allocated solely for federal income Tax purposes among the Acquired Assets and Assumed Liabilities in accordance with a

schedule to be delivered by Buyer to the Sellers within 30 days after the Closing Date (the "Allocation"). The Allocation shall be reasonable and shall be prepared in accordance with Section 1060 of the IRC and the regulations thereunder. The Sellers shall be entitled to review and comment on the Allocation and the Buyer shall consider in good faith the Seller's comments thereon. Subject to the foregoing, the transactions contemplated hereby shall be reported in a manner consistent with the terms of this Agreement, including the Allocation, and none of the Sellers nor Buyer shall take any position inconsistent therewith in any Tax Return, in any refund claim, in any litigation, or otherwise. Buyer and Sellers will each file IRS Form 8594, and all Tax Returns, in accordance with the Allocation agreed upon by the Parties pursuant to the terms of this Section 2.07. Sellers and Buyer each agree to cooperate with each other in preparing IRS Form 8594, and to furnish the other with a copy of such form prepared in draft form within a reasonable period before its filing due date. If such Allocation is disputed by any Governmental Authority, the Buyer or any Seller receiving notice of such dispute will promptly notify the other party, and the parties will use their reasonable best efforts to sustain the Allocation.

## ARTICLE 3
## CLOSING

SECTION 3.01        Closing Date.

The consummation of the transactions contemplated by this Agreement, including the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of Robinson Brog Leinwand Greene Genovese & Gluck P.C. at 875 Third Avenue, New York, NY 10022 at 10:00 a.m. New York time, no later than the 15th Business Day following the date on which the conditions set forth in Article 8 and Article 9 have been satisfied or waived (other than those conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction of such conditions (or the waiver thereof by the party entitled to waive such conditions)), or at such other place or time as the parties hereto may mutually agree in writing. The date and time at which the Closing actually occurs shall be the "Closing Date."

SECTION 3.02        Closing Deliveries by Buyer.

At or prior to the Closing, Buyer shall deliver or cause to be delivered to the Seller:

(a)        Cash equal to the Cash Consideration;

(b)        a certificate of an authorized officer of Buyer, dated as of the Closing Date, in form and substance reasonably satisfactory to Seller, as to a copy of the resolutions of the Manager of the Buyer authorizing and approving Buyer's execution and delivery of this Agreement and the other Transaction Documents to which it is a party and the performance by Buyer of its obligations hereunder and thereunder;

(c)        the Bill of Sale, the Assumption Agreement, the Transition Services Agreement, and each other Transaction Document to which Buyer is a party, duly executed by Buyer;

(d)        the certificates required to be delivered pursuant to <u>Section 9.01</u> and <u>Section 9.02</u>; and

(e)        such other bills of sale, assignments, deeds, endorsements and other good and sufficient instruments of conveyance, assumption and transfer, in form reasonably satisfactory to Sellers as Seller may reasonably request in order to consummate the transactions contemplated hereby.

SECTION 3.03        <u>Closing Deliveries by Sellers</u>.

At or prior to the Closing, Sellers shall deliver or cause to be delivered to Buyer:

(a)        a certificate of an authorized officer of the Seller, dated as of the Closing Date, in form and substance reasonably satisfactory to Buyer, as to a copy of the resolutions of the board of directors of the Seller authorizing and approving its execution and delivery of this Agreement and the other Transaction Documents to which it is a party and the performance by the Seller of its obligations hereunder and thereunder;

(b)        the Bill of Sale, Assumption Agreement, the Transition Services Agreement, and each other Transaction Document (other than the Transaction Documents set forth in <u>Section 3.03(c)</u>) to which each Seller is a party, duly executed by the Sellers party thereto;

(c)        instruments of assignment of the Patents (the "<u>Assignment of Patents</u>"), Trademarks (the "<u>Assignment of Trademarks</u>"), Copyrights (the "<u>Assignment of Copyrights</u>") and Domain Names (the "<u>Assignment of Domain Names</u>") that are owned by the Seller and included in the Acquired Assets, if any, duly executed by the Seller, in form for recordation with the appropriate Governmental Authorities, and any other assignments or instruments with respect to any Transferred Intellectual Property for which an assignment or instrument is required to assign, transfer and convey such assets to Buyer, and which other assignments or instruments shall be in form and substance reasonably acceptable to the Seller and Buyer;

(d)        a certified copy of the Sale Order, as entered by the Bankruptcy Court;

(e)        the certificate required to be delivered pursuant to <u>Section 8.04</u> hereto;

(f)        certificates executed by the Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the IRC; and

(g)        such other bills of sale, assignments, deeds, endorsements, and other good and sufficient instruments of conveyance, assumption and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request in order to consummate the transactions contemplated hereby.

SECTION 3.04 Further Assurances.

At the Closing, and at all times thereafter as may be necessary, Sellers shall execute and deliver to Buyer such other instruments of transfer as shall be reasonably necessary or appropriate to vest in Buyer good and indefeasible title to the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances) and to comply with the purposes and intent of this Agreement and such other instruments as shall be reasonably necessary or appropriate to evidence the assignment by Sellers and assumption by Buyer of the Assigned Contracts, and each of the Parties hereto shall use its reasonable best efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable Law, and execute and deliver such documents and other papers, as may be required to consummate the transactions contemplated by this Agreement.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the corresponding sections or subsections of the Seller's Disclosure Schedule or in any update thereto pursuant to Section 7.05 (whether or not the representations and warranties in this Article 4 expressly refer to such schedule), the Seller hereby jointly and severally represent and warrant to Buyer as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date) as follows:

SECTION 4.01    Organization and Good Standing.

The Seller has the full power and authority to own their respective property and assets, and the Seller has the full power and authority to carry on the Business.  The Seller is a corporation duly organized, validly existing and, except as a result of the commencement or continuance of the Chapter 11 Case, in good standing under the Laws of the State of Delaware and Minnesota.

SECTION 4.02    Authority; Validity; Consents.

Subject to requisite Bankruptcy Court approval, the Seller has the requisite power, capacity and authority necessary to enter into and deliver and perform its obligations under this Agreement and the other Transaction Documents to which the Seller is party and to consummate the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approval, the execution, delivery and performance by the Seller of this Agreement and the other Transaction Documents to which the Seller is party, the performance of each the Seller's obligations hereunder and thereunder and

the consummation of the transactions contemplated herein and therein are within the Seller's powers and, to the extent the Seller is not a natural person, have been duly and validly authorized by all requisite corporate actions in respect thereof and no other corporate proceedings on the part of the Seller is necessary to authorize this Agreement or to consummate the transactions contemplated hereby.  Subject to requisite Bankruptcy Court approval, this Agreement and the other Transaction Documents to which the Seller is party constitute the legal, valid and binding obligations of the Seller enforceable against it in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.  Subject to requisite Bankruptcy Court approval, except as set forth in Section 4.02 of the Seller's Disclosure Schedule, the Seller is not required to give any notice to, make any filing with or obtain any Consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby or thereby.

SECTION 4.03    Subsidiaries.

(a)    Section 4.03 of the Seller's Disclosure Schedule sets forth a complete and accurate list of all Subsidiaries of the Seller.

SECTION 4.04    No Conflict.

When the Consents and other actions described in Section 4.02 of the Seller's Disclosure Schedule have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents, the performance by the Sellers of their respective obligations hereunder and thereunder, and the consummation of the transactions provided for herein and therein will not (with or without notice, lapse of time or both) result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any termination, cancellation, modification or acceleration of any obligation of, the Seller, under any agreement, understanding or Contract to which the Seller is bound.

SECTION 4.05    INTENTIONALLY OMITTED

SECTION 4.06    INTENTIONALLY OMITTED

SECTION 4.07    Environmental Matters.

Except as set forth in Section 4.06 of the Seller's Disclosure Schedule or as would not have a Material Adverse Effect:

(a)    The Seller's have all Environmental, Health and Safety Permits necessary for the lawful operation of the Business as currently conducted;

(b)        the current operations of the Business comply with, and are not subject to any Order that is not generally applicable to Persons engaged in a business similar to the Business with respect to, any Laws concerning environmental, health or safety matters ("Environmental, Health and Safety Laws"), and the Seller has not received written notice alleging that the activities of the Business are in violation of any Environmental, Health and Safety Laws;

(c)        there has been no Release of any Hazardous Substances at, on or under any of the Real Property, and to Seller's Knowledge, none of such properties has been used by any Person as landfill or storage, treatment or disposal site for any type of Hazardous Substance or non-hazardous solid wastes as defined under the Resource Conservation and Recovery Act of 1976, as amended;

(d)        there are no claims, suits or Proceedings by any employee pending or, to Seller's Knowledge, threatened, against the Seller that are premised on the exposure to asbestos or asbestos-containing material in any of the Real Property;

SECTION 4.08    Title to Acquired Assets.

Seller's have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 3.03, and subject to the terms of the Sale Order, the Seller will thereby transfer to Buyer, good and marketable title to, or, in the case of property licensed by the Seller, a valid licensed interest in, all of the Acquired Assets, free and clear of all Encumbrances, except (a) as set forth in Section 4.08 of the Seller's Disclosure Schedule, (b) for the Assumed Liabilities and (c) for Permitted Encumbrances.

SECTION 4.09        INTENTIONALLY OMITTED

SECTION 4.10        Absence of Certain Developments.

Except as required by Law or GAAP, since December 31, 2012, through and including the date hereof:

(a)        the Seller has conducted the Business in the ordinary course of business consistent with past practice;

(b)        there have not occurred any facts, conditions, changes, violations, inaccuracies, circumstances, effects or events that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and

(c)        except as set forth on Section 4.10(c) of the Seller's Disclosure Schedule, neither the Seller has taken or authorized any action which, if taken or authorized on or after the date hereof, would require the consent of the Buyer.

SECTION 4.11    Sufficiency of Assets.

Except as set forth in Section 4.11 of the Seller's Disclosure Schedule, the Acquired Assets, constitute all of the assets, rights and interests of every nature and kind whatsoever necessary for the Buyer to operate the Business from and after the Closing Date in substantially the same manner as the Business is currently being operated by the Seller.

SECTION 4.12    Tangible Property and Equipment.

The Seller has good and valid record and marketable title to, or a valid leasehold interest in, the tangible property and Equipment constituting a portion of the Acquired Assets and the Seller has good and valid record and marketable title to, or a valid leasehold interest in, the tangible property and assets necessary for the conduct of the Business as presently conducted. Except as set forth in Section 4.12 of the Seller's Disclosure Schedule, all such tangible property, and Equipment of the Seller, and all such tangible property are free from material defects, have been maintained in accordance with normal industry practice, and are in good operating condition and repair, subject to normal wear and tear.

SECTION 4.13    Legal Proceedings.

Except as set forth in Section 4.13 of the Seller's Disclosure Schedule, the Seller nor any of their respective officers, directors, shareholders or employees in their capacity as such, is a party to any Proceeding or, to Seller's Knowledge, has been threatened with, any Proceeding. To Seller's Knowledge, there is no outstanding Order of any Governmental Authority to which the Seller is subject nor is Seller in default with respect to any such Order.

SECTION 4.14    Compliance with Laws; Seller Permits.

(a)         Except as set forth in Section 4.14(a) of the Seller's Disclosure Schedule, and except as would not have a Material Adverse Effect, the Seller (i) has conducted and continue to conduct the Business in all material respects in accordance with all Laws and Orders applicable to the Business, (ii) are not in violation of any Law or Order applicable to the operation of the Business and (iii) have not received any notice that any violation of any such Law or Order is being or may be alleged.

SECTION 4.15    Employment Matters.

(a)         Seller is in compliance with all applicable Laws respecting employment and employment practices, terms and conditions of employment and wages and hours, except as would not have a Material Adverse Effect.

SECTION 4.16    Intellectual Property.

(a)        Section 4.16(a) of the Seller's Disclosure Schedule sets forth a true, correct and complete list of all U.S. and foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; (iii) registered Copyrights and pending applications for Copyrights; and (iv) all Domain Names, in each case which is owned by the Seller and all such Intellectual Property is subsisting and, to Seller's Knowledge, valid and enforceable.

(b)        Section 4.16(b) of the Seller's Disclosure Schedule sets forth a true, correct and complete list of all material licenses, sublicenses or other material Contracts to which Seller is a party or otherwise bound pursuant to which Seller has granted to a third party or has been granted or have obtained by or from a third party any right to use any Intellectual Property that is material to the Business (other than Contracts granting rights to use readily available commercial Software that is generally available on nondiscriminatory pricing terms and having an acquisition price of less than $25,000 in the aggregate for all such related Contracts) (each a "License").  Except as otherwise disclosed in Section 4.16(b) of the Seller's Disclosure Schedule, each License is in full force and effect and is a valid and binding obligation of Seller and, to Seller's Knowledge, the other parties thereto, in accordance with its terms and conditions, except as such enforceability may be limited by bankruptcy, insolvency or other similar Laws affecting the enforcement of creditors' rights generally.  Upon entry of the Sale Order and payment of the applicable Determined Cure Costs, to Seller's Knowledge, (x) neither Seller will be in breach or default of its obligations under any License, (y) no condition exists that with notice or lapse of time or both would constitute a default by Seller under any of the Licenses, and (z) to Seller's Knowledge, no other party to any of the Licenses is in breach or default thereunder.

(c)        Seller owns, or has a valid right to use, free and clear of all Encumbrances (other than Permitted Encumbrances and any Encumbrances arising pursuant to the terms of a License), all Intellectual Property used in the Business and such Intellectual Property constitutes all Intellectual Property necessary to conduct the Business.

(d)        Except as disclosed in Section 4.16(d) of the Seller's Disclosure Schedule, (i) the conduct of the Business by Seller (including the products and services currently sold or provided by the Seller) as currently conducted does not infringe, misappropriate or otherwise violate any Person's Intellectual Property, there has been no such claim or Proceeding asserted or threatened in writing in the past three years against the Seller and, to Seller's Knowledge, there is no valid basis for any such claim, and (ii) to Seller's Knowledge, no Person (including any current or former officer, director, employee or contractor of the Seller, is infringing, misappropriating or otherwise violating any Intellectual Property owned or used by the Seller in the conduct of the Business, and no such claims or Proceedings have been asserted or threatened in writing against any Person by the Seller or, to Seller's Knowledge, any other Person, in the past three years, and to Seller's Knowledge, there is no valid basis for any such claim.

(e)        Seller has timely made all filings and payments with the appropriate foreign and domestic agencies required to maintain in subsistence all Registered Intellectual Property owned by the Seller.  All documentation necessary to confirm and affect Seller's ownership of such Intellectual Property, if acquired from other Persons, has been recorded in the United States Patent and Trademark Office, the United States Copyright Office and the corresponding offices of other Governmental Authorities.

(f)        The Seller has taken commercially reasonable measures to protect the secrecy, confidentiality and value of all Trade Secrets used in the Business (collectively, "Business Trade Secrets"), including, but not limited to, entering into appropriate confidentiality agreements with all officers, directors, employees, and other Persons with access to the Business Trade Secrets.  To the Seller's Knowledge, no unauthorized disclosure of any Business Trade Secrets has been made.

(g)        The Seller has a policy of requiring all employees, agents, consultants or contractors who have contributed to or participated in the creation, development, improvement, or modification of Intellectual Property to assign all of their rights therein to the Seller.  To the Seller's Knowledge, no Person has any reasonable basis for claiming any right, title, or interest in and to any such Intellectual Property.

(h)        The IT Systems are adequate in all material respects for their intended use and for the operation of such businesses as are currently operated and as are currently contemplated to be operated by the Seller, and are in good working condition (normal wear and tear excepted).  There has not been any malfunction with respect to any of the material IT Systems during the last three years that has not been remedied or replaced in all material respects.

(i)        The Data that is used or held for use in the Business by the Seller does not infringe or violate the rights of any Person or otherwise violate any Law.

SECTION 4.17    No Brokers or Finders.

With the exception of the fees which have been previously paid to investment bankers to market the Company prior to the Bankruptcy neither the Seller nor any Person acting on the Seller's behalf has paid or become obligated to pay any fee, commission, indemnification or similar payment to any broker, finder, investment banker, agent or intermediary in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

SECTION 4.18    INTENTIONALLY OMITTED

SECTION 4.19    Material Contracts; No Breach of Assigned Contracts.

(a)        Section 4.19(a) of the Seller's Disclosure Schedule sets forth a true and complete list of all Material Contracts.

{00632549.DOC;4 }                                25

(b)    Except as set forth in <u>Section 4.19(b)</u> of the Seller's Disclosure
Schedule, upon entry of the Sale Order and payment of the Determined Cure Costs each
Material Contract is valid and binding on the Seller and is in full force and effect and
enforceable against the Seller in accordance with its terms, except as such enforceability
is limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws now or
hereafter in effect relating to creditors' rights generally or general principles of equity.
The Seller has in all material respects performed all obligations required to be performed
by it to date under each Material Contract.  To the Seller's Knowledge, each counterparty
to each Material Contract has in all material respects performed all obligations required
to be performed by it under such Material Contract.  The Seller does not have any
knowledge of, or has received written notice of, the existence of any event or condition
which constitutes, or, after notice or lapse of time or both, will constitute, a material
breach or violation of or material default on the part of the Seller or its counterparties
under any such Material Contract.  Prior to the date of this Agreement, true and correct
copies of all Material Contracts (including all amendments and modifications thereto) in
effect on the date hereof have been made available to Buyer.

SECTION 4.20    <u>Insurance</u>.

Each insurance policy and insurance arrangement that covers the Acquired
Assets, the Assumed Liabilities, and the Business (the "<u>Insurance Policies</u>") are in full
force and effect, all premiums thereon have been paid, and, to the Knowledge of the
Seller are otherwise in compliance in all material respects with the terms and provisions
of such policies.  To the Knowledge of the Seller: (i) there is no pending notice of
cancellation or non-renewal of any such Insurance Policies, (ii) the termination of any
such Insurance Policies has not been threatened, and (iii) no event, condition or act
(including the purchase of the Acquired Assets hereunder) has occurred and is continuing
or been taken that, with the giving of notice, the lapse of time or the happening of any
other event or condition, would entitle any insurer to terminate or cancel any such
Insurance Policies.

SECTION 4.21    <u>Receivables</u>.

The Receivables, (i) have arisen out of actual sales with unaffiliated third
parties in the ordinary course of business consistent with past practice, (ii) are free and
clear of all defenses and claims of any nature whatsoever other than claims for warranties
and claims made in the ordinary course of business that are not material in the aggregate
to the Business, and (iii) are collectible in the ordinary course of business consistent with
past practice, net of reserves.

**ARTICLE 5**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to Sellers as of the date hereof and
as of the Closing Date (except for representations and warranties that are made as of a
specific date, which are made only as of such date) as follows:

{00632549.DOC;4 }                    26

SECTION 5.01    Organization and Good Standing.

Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware. Buyer has the full power and authority to own its property, carry on its business as now being conducted and as proposed to be conducted following the Closing, and to carry out the transactions contemplated hereby.

SECTION 5.02    Authority; Validity; Consents.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which Buyer is party and the consummation of the transactions contemplated herein and therein have been duly and validly authorized by all necessary corporate actions in respect thereof. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligations of Buyer, enforceable against it in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Buyer is not required to give any notice to, make any filing with or obtain any Consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby or thereby.

SECTION 5.03    No Conflict.

The execution and delivery of this Agreement and the other Transaction Documents, the performance by the Buyer of its respective obligations hereunder and thereunder, and the consummation of the transactions provided for herein and therein will not (with or without notice, lapse of time or both) result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any termination, cancellation, modification or acceleration of any obligation of, the Buyer, result in a loss of any benefit to which the Buyer is entitled to, or result in the creation of any material Encumbrance upon any assets or properties of the Buyer, under (a) any agreement, understanding or Contract, to which any of the Buyer or any of its properties or assets is bound, (b) the certificates of formation or incorporation, bylaws or other organizational or governing documents Buyer, (c) any Order, or (d) any Seller Permit or Law; in the case of the preceding clauses (a), (c) and (d), except for such breaches, defaults, conflicts or accelerations that do not, and are not reasonably likely to, individually or in the aggregate, materially and adversely affect the ability of Buyer to carry out its obligations under this Agreement and the other Transaction Documents to which it is a party, and to consummate the transactions contemplated hereby.

SECTION 5.04    No Brokers or Finders.

Neither Buyer nor any Person acting on its behalf has paid or become obligated to pay any fee, commission, indemnification or similar payment to any broker, finder, investment banker, agent or intermediary in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which any Seller is or will become liable, and Buyer shall indemnify and hold harmless Sellers from any claims with respect to any such fees, commissions or similar payments.

SECTION 5.05    Buyer's Acknowledgment.

Buyer is not aware of any facts or circumstance, which (with or without notice or lapse of time or both) would cause any representations or warranties of any Seller to be untrue or incorrect in any respect.

SECTION 5.06    Acquired Assets "AS IS"; Buyer's Acknowledgment Regarding Same.

Buyer agrees, warrants, and represents that, except as set forth in this Agreement, (a) Buyer is purchasing the Acquired Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on Buyer's own investigation of the Acquired Assets and (b) neither the Seller nor any real estate broker, agent, officer, employee, servant, attorney, or representative of any Seller has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Acquired Assets or the Assumed Liabilities, any part of the Acquired Assets or the Assumed Liabilities, relating to the financial performance of the Acquired Assets or the Business, or the physical condition of the Acquired Assets.  Buyer further acknowledges that the consideration for the Acquired Assets specified in this Agreement has been agreed upon by Seller and Buyer after good-faith arms-length negotiation in light of Buyer's agreement to purchase the Acquired Assets "AS IS" and "WITH ALL FAULTS".  Buyer confirms that Seller has made available to Buyer the opportunity to ask questions of the officers and management of the Seller and to acquire additional information about the Business, the Acquired Assets and the Assumed Liabilities.  Buyer agrees, warrants, and represents that, except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon Buyer's own investigation of all such matters, and that Buyer assumes all risks with respect thereto.  EXCEPT AS SET FORTH IN THIS AGREEMENT, THE SELLER DOES NOT MAKE ANY EXPRESS WARRANTY, ANY WARRANTY OF MERCHANTABILITY, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, OR ANY IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE ACQUIRED ASSETS, OR THE BUSINESS.

## ARTICLE 6
## BANKRUPTCY COURT MATTERS

SECTION 6.01    Bankruptcy Court Approval.

(a)    Seller and Buyer acknowledge that this Agreement and the sale by Seller of the Seller Acquired Assets (including the assumption and assignment of the Assigned Contracts) are subject to Bankruptcy Court approval after commencement of the Chapter 11 Case.  Seller and Buyer further acknowledge that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or best price for the Acquired Assets, including giving notice thereof to Seller creditors and other interested parties, providing information about the Acquired Assets to prospective bidders, entertaining higher or better qualified offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an auction, all in accordance with the Bid Procedures Order, as and when the same is approved by the Bankruptcy Court.

(b)    In furtherance of the foregoing, Seller shall use commercially reasonable efforts (including the filing of the necessary motions) to obtain entry by the Bankruptcy Court of the Bid Procedures Order (including approval of the Break-up Fee and Expense Reimbursement as set forth in the Bid Procedures Motion within 20 calendar days after the Petition Date.

(c)    In the event that the Bid Procedures Order and Sale Order are entered by the Bankruptcy Court, and an appeal is taken or a stay pending appeal is requested from either such Orders, Seller shall immediately notify Buyer of such appeal or stay request, and shall promptly provide to Buyer a copy of the related notice of appeal or Order of stay.  Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such Orders.  From and after the date hereof until the Closing Date, Seller shall not take any action which is intended to result in, or fail to take any action the intent of which failure to act would result in the reversal, voiding, modification or staying of the Bid Procedures Order or Sale Order.

SECTION 6.02    Bankruptcy Court Filings.

From and after the date hereof until the Closing Date, Seller shall deliver to Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that are filed in the Chapter 11 Case at the time of their filing, but with respect to any such papers that any Seller may file that relates, in whole or in part, to this Agreement, or Buyer, its constituent members or its or their agents or representatives, Sellers shall use their respective reasonable efforts to provide such prior notice as may be reasonable under the circumstances before the filing of such papers.

SECTION 6.03    Break-up Fee and Expense Reimbursement.  The Buyer shall be entitled reimbursement of actual reasonable expenses (the "Expense Reimbursement"),

including, without limitation, attorney's fees and other costs and disbursements incurred by the Buyer), not to exceed $25,000 (Purchaser shall be required to provide reasonable documentation of such expenses to Seller), and (iii) a breakup fee in the amount of $100,000 (the "Breakup Fee" which together with the Expense Reimbursement shall be referred to as the "Break-up Fee and Expense Reimbursement"). The Break-up Fee and Expense Reimbursement shall be payable to Buyer only if: (x) Buyer is not in material breach of its obligations under this Agreement, which breach or default has not been waived in writing by the Seller; (y) Buyer and Seller have not otherwise terminated this Agreement pursuant to Section 10.01(a)(ii); and (z) following the Auction, either (1) the Bankruptcy Court approves an Alternative Proposal as the Successful Bid, and the closing of a transaction in respect of such Alternative Proposal has occurred, or (2) Buyer is the Successful Bidder, the conditions set forth in Article 8 and Article 9 have been satisfied or waived in accordance with Section 11.05 on or prior to the Termination Date, and the Buyer has represented to the Seller that it is ready, willing and able to consummate the transactions contemplated hereby, but the Seller fails to so consummate the transactions contemplated hereby; provided that in the case of clause (2) the payment to Buyer of the Break-Up Fee and Expense Reimbursement shall not constitute Buyer's exclusive remedy.

SECTION 6.04    Assumption and Assignment of Assigned Contracts.

(a)    On the Closing Date, and pursuant to the Sale Order (as it shall have become a Final Order), and/or the consent of the applicable counterparties to the extent necessary to effect the assumption and assignment, Seller shall assume and assign to Buyer, and Buyer shall assume from Seller, the Assigned Contracts.

(b)    Notwithstanding any provision in this Agreement to the contrary, from and after the date hereof through the Closing Date, the Seller will not reject or take any action to reject, repudiate or disclaim (or fail to take any action that would result in rejection, repudiation or disclaimer by operation of law of), any Contract without the prior written consent of Buyer.  Further, Seller shall file in the Chapter 11 Case such motions or pleadings (i) as may be appropriate and necessary to preserve Seller's right or ability to assume and assign any of the Assigned Contracts..

(c)    To the extent that any Assigned Contract to be sold, transferred, conveyed or assigned (any sale, transfer, conveyance or assignment, a "Transfer") to Buyer pursuant to the terms of Section 2.01 is not capable of being so Transferred to Buyer (after giving effect to the Sale Order as it shall have become a Final Order) without the Consent of a third Person (each such Contract, a "Consent Pending Contract"), or if such Transfer or attempted Transfer, or the subsequent Transfer or attempted Transfer of the equity interests of Buyer would, constitute a breach thereof or a violation of any Law or Order, nothing in this Agreement or in any document, agreement or instrument delivered pursuant to this Agreement will constitute a Transfer or an attempted Transfer thereof prior to the time at which all Consents necessary for such Transfer have been obtained unless an Order of the Bankruptcy Court effects such Transfer without such Consent.

{00632549.DOC;4 }                                    30

(d)         Seller shall hold and not reject pursuant to section 365 of the Bankruptcy Code any Consent Pending Contracts for a period of sixty (60) calendar days following the Closing Date (the "Contract Retention Period") and otherwise after receiving further written notice(s) (each, an "Assumption Notice") from Buyer during the Contract Retention Period requesting assumption and assignment of any Consent Pending Contract, Seller shall, subject to Buyer's demonstrating adequate assurance of future performance thereunder (if applicable), take all actions reasonably necessary to seek to assume and assign to Buyer pursuant to section 365 of the Bankruptcy Code any Contract(s) set forth in an Assumption Notice, and any applicable Determined Cure Cost shall be satisfied in accordance with Section 6.05(c) hereof.  Seller agrees and acknowledges that the covenant set forth in this Section 6.04(d) shall survive the Closing; provided, that, with respect to any Consent Pending Contract, Buyer shall compensate Seller for Liabilities for the continuation of such Consent Pending Contracts during the Contract Retention Period up to and including the date which is ten (10) calendar days following Seller's receipt of written notice from Buyer authorizing rejection of the same, it being understood and agreed that Seller's obligation to assume and assign any Consent Pending Contract shall be conditioned upon Buyer's payment of such amounts and that Buyer's covenant to pay such amounts shall survive the Closing until the later of (x) the termination of the Contract Retention Period and (y) payment in full by Buyer to Seller of such amounts required to be paid prior to such termination.  Notwithstanding anything in this Agreement to the contrary, on the date any Contract is assumed and assigned to Buyer pursuant to this Section 6.04(d), such Contract shall be deemed an Assigned Contract, as applicable.  Seller shall have the right at any time following the expiration of the Contract Retention Period to reject any Consent Pending Contracts pursuant to section 365 of the Bankruptcy Code.

SECTION 6.05   Determined Cure Costs.

(a)         Seller shall use commercially reasonable efforts, including the filing and prosecution of any and all appropriate proceedings in the Bankruptcy Court, to establish the Estimated Cure Cost for each Assigned Contract as the Determined Cure Cost for such Assigned Contract, as applicable.

(b)         By not later than five calendar days before the Sale Hearing, Seller shall make available, or cause to be made available, to Buyer (i) true and complete copies of the Assigned Contracts, or in the case of oral Assigned Contracts, true and complete written descriptions thereof (in each case including all amendments thereto and assignments thereof), and (ii) a schedule of Seller's good faith estimate of the Cure Costs (as the same may be updated, supplemented or amended, the "Estimated Cure Costs"), if any, associated with each Assigned Contract.

(c)         On the Closing Date, or as soon as reasonably practicable thereafter, in connection with the assumption by Seller, and assignment to Buyer, of the Assigned Contracts, Buyer shall make provision for the payment of the Determined Cure Costs in accordance with a Final Order of the Bankruptcy Court providing for such Determined Cure Costs (which may be the Sale Order (as it shall have become a Final

Order)); provided, however, that, notwithstanding anything to the contrary herein (including the deadline applicable to and set forth in the lead-in to Section 2.02(b)(i)), if the Determined Cure Cost for any Contract that, at the time, is an Assigned Contract, respectively, exceeds the Estimated Cure Cost in respect of such Contract, then Buyer, in its sole discretion, may (on notice to Seller and the applicable counterparty) elect to amend Section 1.01(b)(i) or Section 1.01(b)(ii) of the Seller's Disclosure Schedule, as applicable, so as to exclude such Contract, whereupon such Contract so excluded shall not constitute an "Assigned Contract" (and shall therefore constitute an "Excluded Asset"), and Buyer shall not acquire any rights, or assume any Liabilities, with respect to such Contract so excluded.  Notwithstanding anything to the contrary herein, Buyer shall in no way be liable for Determined Cure Costs related to any Contract excluded from Section 1.01(b)(i) or Section 1.01(b)(ii) of the Seller's Disclosure Schedule, as applicable, in accordance with either this Section 6.05(c) or Section 2.02(b)(i).

## ARTICLE 7
## ADDITIONAL AGREEMENTS

SECTION 7.01    Investigation of the Business By Buyer Prior to Closing.

(a)        From and after the date hereof until the Closing, and subject to the confidentiality obligations to which Sellers may be bound, upon reasonable notice, Seller shall, afford Buyer's Representatives reasonable access during normal business hours to the offices, key employees.

SECTION 7.02    Conduct of Business Prior to the Closing Date.

Between the date hereof and the Closing, Seller shall, use its reasonable best efforts to maintain, or cause the maintenance of, the Acquired Assets and Business, and operate and carry on the Business only in the ordinary course consistent with past practice and taking into account Seller's status as debtor and debtor in possession except as otherwise expressly provided in this Agreement.

SECTION 7.03    Third Party Consents.

Subject to Section 6.04(c) and Section 6.04(d), from and after the date hereof until the Closing, the Seller, on the one hand, and Buyer, on the other hand, will use their reasonable best efforts to cooperate with the other to secure, before the Closing Date, all Third Party Consents to the extent such Third Party Consents are not provided for or satisfied by the Sale Order; provided, however, that neither Buyer nor Seller shall be required to waive any of the conditions to Closing set forth in Article 8 or Article 9, respectively.

SECTION 7.04    Reasonable Best Efforts.

(a)        From and after the date hereof until the Closing Date, Seller and Buyer shall use their respective reasonable best efforts to cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with

{00632549.DOC;4 }                                32

applicable Laws and Orders to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur.

SECTION 7.05    Seller's Disclosure Schedule.

(a)    The parties hereto acknowledge and agree that (i) the Seller's Disclosure Schedule delivered to Buyer on the date hereof and attached hereto as Exhibit H is in draft form only, and (ii) from and after the date hereof, the parties hereto shall use their commercially reasonable efforts to cooperate to negotiate and finalize the Seller's Disclosure Schedule..

SECTION 7.06    Notice of Developments.

From and after the date hereof until the Closing, Seller shall promptly notify Buyer of (a) any change or development which would cause any of the representations and warranties in Article 4 above not to be true and correct in all material respects, or (b) any material failure of Sellers to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement.

SECTION 7.07    Taxes.

(a)    Except as specifically set forth in this Section 7.07 (including Section 7.07(b)), Seller shall be liable for and shall pay, and pursuant to Section 7.07(c) shall reimburse Buyer for, all Taxes (whether assessed or unassessed) applicable to the Business and the Acquired Assets, in each case attributable to periods (or portions thereof) ending on or prior to the Closing Date. Without limiting the obligations of Buyer contained elsewhere in this Agreement (including Section 7.07(b)), Buyer shall be liable for and shall pay, and pursuant to Section 7.07(c) shall reimburse the applicable Seller for, all Taxes (whether assessed or unassessed) applicable to the Business, the Acquired Assets and the Assumed Liabilities, in each case attributable to periods (or portions thereof) beginning after the Closing Date. For purposes of this Section 7.07(a), any period beginning before and ending after the Closing Date shall be treated as two partial periods, one ending on the Closing Date and the other beginning on the day after the Closing Date except that Taxes (such as property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(b)    Without limiting the other terms set forth in this Agreement, any sales Tax, use Tax, real property transfer or gains Tax, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Acquired Assets and not exempted under the Sale Order or by Section 1146(c) of the Bankruptcy Code ("Transfer Taxes") shall be borne by Buyer. Sellers and Buyer shall use their respective reasonable best efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes. Buyer shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by the Seller, Buyer shall prepare and deliver to Sellers a copy of such Tax Return at least ten days before the due date thereof,

and Sellers shall promptly execute such Tax Return and deliver it to Buyer, which shall cause it to be filed.

(c)      The Seller or Buyer, as the case may be, shall provide reimbursement for any Tax paid by one party all or a portion of which is the responsibility of the other party in accordance with the terms of this Section 7.01.  Within a reasonable time prior to the payment of any such Tax, the party paying such Tax shall give notice to the other of the Tax payable and each party's respective Liability therefor, although failure to do so will not relieve the other party from its Liability hereunder.

SECTION 7.08      Collection of Receivables.

If, after the Closing Date, the Seller shall receive payment from any account debtor with respect to any Assigned Contract, Seller shall, promptly thereafter deliver such funds and assets to Buyer and take all steps necessary to vest title to such funds and/or assets in Buyer.

SECTION 7.09      Employee Matters.

Nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any employee of the Seller.  No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of the Seller or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including without limitation, in respect of continued employment (or resumed employment) for any specified period.

**ARTICLE 8**
**CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER**

The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by the Buyer:

SECTION 8.01      INTENTIONALLY OMITTED

SECTION 8.02      INTENTIONALLY OMITTED

SECTION 8.03      Accuracy of Representations

All of the representations and warranties made by Seller in this Agreement shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such

date); provided, however, that in the event of a breach of a representation or warranty, other than a representation or warranty qualified by a Material Adverse Effect, the condition set forth in this Section 8.03 shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in a Material Adverse Effect. Buyer shall have received a certificate signed by a duly authorized representative of the Seller to such effect.

SECTION 8.04    Seller's Performance

Seller shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by the Seller on or prior to the Closing Date, and Buyer shall have received a certificate signed by a duly authorized representative of the Seller to such effect.

SECTION 8.05    No Order

No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order or Law which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

SECTION 8.06    No Proceedings.

There shall not be pending or threatened by any Governmental Authority any Proceeding challenging or seeking to enjoin or otherwise prohibit any of the transactions contemplated by this Agreement or seeking to obtain from Buyer in connection with the transactions contemplated by this Agreement any damages or to impose any restrictions or conditions.

SECTION 8.07    Consents and Approvals.

All Consents of any Person (including any Governmental Authority) which are necessary to consummate the transactions contemplated hereby as set forth on Section 8.07 of the Seller's Disclosure Schedule shall have been filed, been obtained or occurred and such Consents shall not have expired or been withdrawn.

SECTION 8.08    No Material Adverse Effect.

Since the date hereof, there shall not have occurred any state of facts, event, or change in circumstance that has had or could reasonably be expected to have a Material Adverse Effect on the Acquired Assets, as a whole, or the Business.

SECTION 8.09    Seller's Deliveries.

Each of the deliveries required to be made to Buyer pursuant to Section 3.03 shall have been so delivered.

SECTION 8.10    Sale Order.

The Bankruptcy Court shall have issued the Sale Order which Sale Order shall have become a Final Order by not later than the Outside Date.

SECTION 8.11    Delivery of Final Seller's Disclosure Schedule.

At least 10 Business Days prior to Closing, the Sellers shall deliver, or cause to be delivered, to the Buyer the final Seller's Disclosure Schedule.

## ARTICLE 9
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of the Seller to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived the Seller:

SECTION 9.01    Accuracy of Representations.

All of the representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality, which shall be true and correct in all respects) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date). Sellers shall have received a certificate signed by a duly authorized representative of Buyer to such effect.

SECTION 9.02    Buyer's Performance.

Buyer shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by Buyer on or prior to the Closing Date, and Seller shall have received a certificate signed by a duly authorized representative of Buyer to such effect.

SECTION 9.03    No Order.

No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order or Law which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

SECTION 9.04    No Proceedings.

There shall not be pending or threatened by any Governmental Authority any Proceeding challenging or seeking to enjoin or otherwise prohibit any of the transactions contemplated by this Agreement or seeking to obtain from Buyer in

connection with the transactions contemplated by this Agreement any damages or to impose any restrictions or conditions.

SECTION 9.05    Consents and Approvals.

All Consents from any Person (including any Governmental Authority) which are necessary to consummate the transactions contemplated hereby shall have been filed, been obtained or occurred and such Consents shall not have expired or been withdrawn.

SECTION 9.06    Buyer's Deliveries.

Each of the deliveries required to be made to Sellers pursuant to Section 3.02 shall have been so delivered.

SECTION 9.07    Sale Order.

The Bankruptcy Court shall have issued the Sale Order which Sale Order shall have become a Final Order by not later than the Outside Date.

SECTION 9.08    Payment of Purchase Price.

Buyer shall have paid the Purchase Price in accordance with Section 3.02(a).

## ARTICLE 10
## TERMINATION

SECTION 10.01    Termination.

Notwithstanding anything contained to the contrary in this Agreement, this Agreement may be terminated at any time prior to the Closing Date:

(a)    by either the Seller or the Buyer:

(i)    if a Governmental Authority of competent jurisdiction issues a final non-appealable ruling or Order that permanently enjoins or otherwise prohibits the transactions contemplated hereby; or

(ii)    upon mutual written consent of Sellers and Buyer.

(b)    by Buyer:

(i)    if the Closing Date shall not have occurred by the Outside Date; provided, however, that the right to terminate this Agreement under this Section 10.01(b)(i) shall not be available to the Buyer if the Buyer's failure to fulfill any obligation under this Agreement shall have been the

cause of, or shall have resulted in, the failure of the Closing to have occurred on or prior to such date;

(ii)    in the event of any material breach by Seller of any of Seller's agreements, covenants, representations or warranties contained herein, or of the Bid Procedures Order or the Sale Order, and the failure of Sellers to cure such breach within seven days after receipt of the Buyer Termination Notice specified in this subsection; provided, however, that Buyer (i) is not itself in material breach of its representations, warranties, covenants or agreements contained herein or in the Bid Procedures Order or the Sale Order, (ii) notifies Sellers in writing (the "Buyer Termination Notice") of its intention to exercise its rights under this Agreement as a result of the breach, and (iii) specifies in such Buyer Termination Notice the representation, warranty, covenant or agreement contained herein or in the Bid Procedures Order or the Sale Order of which Sellers are allegedly in material breach;

(iii)    if (A) the Bankruptcy Court fails to enter the Bid Procedures Order on or before the date that is 30 days following the Petition Date, (B) Sellers fail to hold an auction pursuant to the Bid Procedures Order on or before September 4, 2013, (C) the Bankruptcy Court fails to enter an Order designating Buyer as the successful bidder on or before September 8, 2013, (D) the Bankruptcy Court fails have issued the Sale Order which Sale Order shall have become a Final Order by on or prior to the Outside Date;

(iv)    if the Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for Sellers and such trustee rejects the transactions contemplated by this Agreement;

(v)    Buyer is not the prevailing bidder in the auction pursuant to the Bid Procedures or the Bankruptcy Court enters an Order authorizing the Sellers or any of their Affiliates to enter into any Contract with respect to or consummate an Alternative Proposal;

(vi)    the Bid Procedures Order or the Sale Order has been stayed, modified, amended, supplemented, reversed, vacated or otherwise rendered ineffective by any court of competent jurisdiction without Buyer's prior written consent or otherwise fails to be in full force and effect; or

(vii)    any event of default under the cash collateral agreement shall have occurred and be continuing.

(c)       by the Seller, in the event of any material breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein, or of the Bid Procedures Order or the Sale Order, and the failure of the Buyer to cure such breach within seven days after receipt of the Seller Termination Notice specified in this subsection; provided, however, that (i) Seller is not itself in material breach of its representations, warranties, covenants or agreements contained herein or in the Bid Procedures Order or the Sale Order, (ii) Seller notifies Buyer in writing (the "Seller's Termination Notice"), and (iii) Seller specifies in such Seller's Termination Notice the representation, warranty, covenant or agreement contained herein or in the Bid Procedures Order or the Sale Order of which Buyer is allegedly in material breach.

SECTION 10.02   Effect of Termination.  In the event of termination of this Agreement by either party in accordance with Section 10.01 hereof, all rights and obligations of the parties under this Agreement shall terminate without any Liability of any party to any other party; provided, however, that the provisions of Section 6.03 and Article 11 (except Section 11.01) shall expressly survive the expiration or termination of this Agreement.

# ARTICLE 11
# GENERAL PROVISIONS

SECTION 11.01   Survival of Representations, Warranties and Covenants.

All representations and warranties herein shall terminate on the Closing Date.  The covenants and agreements contained herein that are required to be performed on or prior to the Closing Date shall terminate on the Closing Date and the covenants that require performance after the Closing Date shall survive in accordance with the terms thereof.

SECTION 11.02   Confidential Nature of Obligations.

Subject to any disclosure requirements under the Bankruptcy Code or imposed by the Bankruptcy Court, Buyer and Sellers each agree that it will treat in confidence all documents, materials and other information which it shall have obtained regarding the other party during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents, and, in the event the transactions contemplated hereby shall not be consummated, at the request of the disclosing party, will return to the other party all copies of nonpublic documents and materials which have been furnished in connection therewith.  Such non-public documents, materials and information shall not be communicated to any third Person (other than to Buyer's and Seller's counsel, accountants or financial advisors, in each case subject to the recipient's agreement to keep the same confidential).  No other party shall use any confidential information in any manner whatsoever except solely for the purpose of evaluating the proposed purchase and sale of the Acquired Assets; provided, however, that after the

Closing, any confidential information included in the Acquired Assets or the Assumed Liabilities shall be deemed the confidential information of Buyer, and the Seller shall maintain the confidentiality thereof in accordance with this <u>Section 11.02</u>. The obligation of each party to treat such documents, materials and other information in confidence shall not apply to any information which (i) is or becomes available to such party from a source other than the disclosing party, (ii) is or becomes available to the public other than as a result of disclosure by such party or its agents or (iii) is required to be disclosed under applicable Law (including under the Bankruptcy Code or as required by the Bankruptcy Court), but only to the extent it must be disclosed. Notwithstanding clause (iii) of the preceding sentence, in the event that any party is required to disclose any confidential information by applicable Law or rule of any national securities exchange, it is agreed that the party subject to such requirement will provide the other party with prompt notice of such requirement and such party may seek an appropriate protective order if it so desires.

SECTION 11.03    <u>Public Announcements</u>.

Unless otherwise required by applicable Law or by obligations of the parties hereto or any of their Affiliates pursuant to any listing agreement with or rules of any securities exchange, the parties hereto shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other party and shall not issue any such release or make any such statement without the prior written consent of the other party (such consent not to be unreasonably withheld or delayed).

SECTION 11.04    <u>Notices</u>.

All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given: (a) on the same Business Day if sent by email followed by facsimile (with written confirmation of receipt), (b) when delivered by hand (with written confirmation of receipt) to the addresses set forth above, (c) when received by the addressee, if sent by a delivery service (prepaid, receipt requested) or (d) when received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses, representative (if applicable) and facsimile numbers set forth below (or to such other addresses, representative and facsimile numbers as a party may designate by notice to the other Parties given in accordance with this <u>Section 11.04</u>):

SECTION 11.05    <u>Waiver</u>.

Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise

of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable Law, (a) no waiver that may be given by a party shall be applicable except in the specific instance for which it is given; and (b) no notice to or demand on one party shall be deemed to be a waiver of any right of the party giving such notice or demand to take further action without notice or demand.

SECTION 11.06   Entire Agreement; Amendment.

This Agreement (including the disclosure schedules and the exhibits hereto) and the other Transaction Documents supersede all prior agreements (other than the Confidentiality Agreement, which shall remain in full force and effect) between the Parties with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between the Parties with respect to their subject matter (other than the Confidentiality Agreement, which shall remain in full force and effect). This Agreement may not be amended except by a written agreement executed by the Parties.

SECTION 11.07   Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any party hereto by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other party); provided, however, that, prior to Closing, Buyer shall be permitted, to assign all or part of its rights or obligations hereunder to a related party, whereupon, references to "Buyer" herein shall be deemed to refer to such related party; provided further that any such assignment shall not relieve Buyer of any of its financial obligations to Sellers hereunder and that any assignee must also be a qualified bidder as set forth in the Bidding Procedures Order.

SECTION 11.08   Severability.

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party in any material respect. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

SECTION 11.09   Section Headings, Construction.

The headings of Sections in this Agreement are provided for convenience only and shall not affect its construction or interpretation. All references to "Article,"

"Section" or "Sections" refer to the corresponding Article, Section or Sections of this Agreement. All words used in this Agreement shall be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms. The Exhibits attached hereto and the Schedules attached hereto (including the Seller's Disclosure Schedule) are hereby incorporated herein and made a part hereof as if fully set forth herein.

SECTION 11.10   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York applicable to Contracts executed in and to be performed in that State, and, to the extent applicable, the Bankruptcy Code.

(b)    The Parties agree that the Bankruptcy Court shall be the exclusive forum for enforcement of this Agreement or the transactions contemplated hereby and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; *provided* that if the Bankruptcy Court determines that it does not have subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party: (i) agrees that all such actions or proceedings shall be heard and determined in a New York federal court sitting in The City of New York; (ii) irrevocably submits to the jurisdiction of such court in any such action or proceeding; (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (iv) agrees that service of process in any such action or proceeding may be effected by providing a copy thereof by any of the methods of delivery permitted by Section 11.04 to such party at its address as provided in Section 11.04 (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Law).

(c)    EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.10(C).

SECTION 11.11    Counterparts.

      This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 11.12    Time of Essence.

      Time is of the essence in this Agreement.

SECTION 11.13    No Third Party Beneficiaries.

      This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

SECTION 11.14    Expenses.

      Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors, accountants and other advisors, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, subject to Bankruptcy Court approval, whether or not the Closing shall have occurred.

*[Remainder of page intentionally left blank; signature pages follow]*

{00632549.DOC;4 }                                    43

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the year and date first above written.

R4 Vascular, Inc.,


By: */s/ Steven Jacobs*_____
    Name:
    Title: President

White Sand Beach LLC


By: */s/ Douglas Wall*_____
    Name: Douglas Wall
    Title: Manager

Exhibit A

<u>Form of Assignment of Copyrights</u>

# ASSIGNMENT OF COPYRIGHTS

**KNOW ALL MEN BY THESE PRESENTS**, the undersigned,

R4 Vascular, Inc., a Delaware corporation (herein referred to as "***Assignor***"), for and in consideration of the sum of the purchase price as described in the Asset Purchase Agreement which terms are incorporated herein hereby assign, transfer, to White Sand Beach LLC (herein referred to as "***Assignee***"), its successors and assigns forever, all of its rights, title and interest in and to the Copyrights identified on <u>Exhibit "A",</u> together with any and all assignor's existing copyrights therein throughout the United States and the world for the life of the copyrights, as extended, renewed, or modified, and any and all Assignor's rights of every kind, nature or description attaching to or which may attach to said items identified on Exhibit A, provided Assignee agrees to the understandings, rights and obligations of the parties contained herein as follows:

## UNDERSTANDING, RIGHTS AND OBLIGATIONS OF PARTIES

1.  This Agreement shall be binding on the respective parties, their heirs, successors, and assigns, and shall be governed by and interpreted in accordance with the laws of the State of New York.

2.  This Agreement contains all of the understandings, oral and written, of the parties and merges all previous Agreements.

3.  If any of this Agreement is found to be invalid or unenforceable, it shall not affect the balance of this Agreement.

**IN WITNESS WHEREOF,** the undersigned has executed the foregoing instrument on this _____ day of _____, 2013

ASSIGNEE: By: _____

ASSIGNOR: By: _____

{00634777.DOC;1 }

Exhibit "A"

Exhibit B

<u>Form of Assignment of Domain Names</u>

## ASSIGNMENT

**WHEREAS**, R4 Vascular, Inc., ("*Assignor*") is the registrant of the domain name r4vascular.com and the website associated therewith (the "*Domain Name*");

**WHEREAS** White Sand Beach, LLC, a Delaware limited liability company ("*Assignee*"), is desirous of acquiring a one hundred percent interest in said Domain Name;

**WHEREAS**, Assignor and Assignee are parties to a certain Asset Purchase Agreement dated as of the date hereof (the "*APA*") whose terms and conditions are incorporated herein;

**WHEREAS**, the APA provides that Assignor assign to Assignee Assignor's right, title and interest in and to the Domain Name;

**NOW, THEREFORE**, in consideration of the purchase price as described in the APA, receipt of which is hereby acknowledged, Assignor has sold, assigned and transferred, and by these presents does hereby sell, assign and transfer unto Assignee, its successors, assigns or other legal representatives, free and clear of any liens, charges, pledges, security interests, imperfections of title, claims or other encumbrances, one half of Assignor's right, title and interest, in the United States and internationally, including common law rights, in and to the Domain Name, and the trade name and all other intellectual property rights associated therewith, together with the goodwill of the business in connection with which the Domain Name is used and the right to sue for and collect damages for past infringement of said Domain Name (collectively, the "*Subject Interest*"). Assignor agrees to execute, acknowledge and deliver to the Assignee, at the Assignee's expense, all documents, and to take all actions reasonably required by such other party from time to time to confirm or effect the matters set forth herein, or otherwise to carry out the purpose of this Assignment, including, without limitation, executing and providing any affidavits, intermediate recordings or additional assignments required by the applicable governmental intellectual property offices worldwide to complete and record the transfer. Assignor hereby represents and warrants to Assignee as follows: (i) this Assignment has been duly executed and delivered by Assignor and constitutes the legal, valid and binding obligation of Assignor, enforceable against Assignor in accordance with its terms, (ii)Assignor has, and upon the consummation of the purchase and sale contemplated hereunder Assignee will have, good, clear record title to the Subject Interest, free and clear of any lien, claim or encumbrance of any nature; (iii) other than the consents needed in the APA there Are no consents or approval of, filing with or notification to, any governmental authority or any other person that is required to be made or obtained by Assignor to assign the Subject Interest to the Assignee hereunder other than approvals that have already been obtained.

IN WITNESS WHEREOF, Assignor has executed this instrument on this _____ day of _____, 2013.

R4 VASCULAR, INC.

_____

By:
Its:

{00634779.DOC;1 }

1

Exhibit C

<u>Form of Assignment of Patents</u>

## ASSIGNMENT OF PATENT RIGHTS

This Assignment of Patent Rights (this "Agreement") by and between R4 Vascular, Inc., a Delaware corporation with an address at 1270 Avenue of the Americas, Ste 302, New York, NY 10020, ("Seller" or the "Company") and White Sand Beach, LLC, a Delaware limited liability company with an address at c/o Robinson Brog Leinwand Greene Genovese & Gluck P.C. 875 Third Avenue New York, NY 10022 ("Buyer").

WHEREAS, the Company., filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"), Case No. 13-12409 (SCC); and

WHEREAS, Buyer and Seller entered into an Asset Purchase Agreement pursuant to which the Seller for the consideration described therein agreed to transfer and assign all of its patent rights to the Buyer;

NOW, THEREFORE, in consideration of the foregoing premises and in consideration of good and valuable consideration received pursuant to the APA which terms are included herein, the receipt of which is hereby acknowledged by the Seller, the Seller hereby sells, assigns, and transfers to the Buyer, and any successors and assigns, the Seller's bankruptcy estate's entire right, title, and interest in and to the Patents listed on Exhibit A hereto and any and all inventions that are disclosed in the Patents and in and to all divisionals, continuations, continuation-in-parts, substitutes, renewals, reissues, and all other patent applications that have been or shall be filed in the United States on any of said inventions, and in and to all original and reissued patents that have been or shall be issued in the United States on said inventions, and in and to all rights of priority resulting from the filing of said Patents, and in and to any and all past, present and future causes of action and enforcement rights, relating to any of the foregoing, including without limitation, all rights to pursue damages, injunctive relief, and other remedies arising out or in connection with the infringement of the foregoing and to all rights of access to all information relating to the foregoing, including, without limitation, all rights of access to all confidential information relating to the foregoing that are subject to attorney/client privileges.

IN WITNESS WHEREOF, the Seller has executed this ASSIGNMENT of PATENT RIGHTS.

R4 Vascular, Inc

DATE:_____, 2013

_____
By:
Its:

Exhibit A

    1. Issued patent #8,079,990 B2
    2. Pending application 12/610,102

Exhibit D

Form of Assignment of Trademarks

## TRADEMARK ASSIGNMENT

As of _____, 2013

THIS ASSIGNMENT is made between R4 Vascular, Inc., (hereinafter referred to as "*Assignor*"), and White Sand Beach, LLC, a Delaware limited liability company (hereinafter referred to as "*Assignee*").

WHEREAS, Assignor has adopted and is using trademarks for which it has filed applications for registration in the United States Patent and Trademark Office (hereinafter referred to as "*Marks*") which are currently pending and/or registered and are listed in Schedule A, attached hereto and incorporated herewith and made part of this Assignment; and

WHEREAS, Assignor and Assignee have entered into an Asset Purchase Agreement pursuant to which Assignor has agreed to assign for the consideration described therein the Marks, along with the goodwill of the business pertaining thereto;

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Assignor does hereby assign, and transfer to Assignee, free and clear of all liens and encumbrances, all of its right, title, and interest in and to the Marks, together with the goodwill of the business symbolized by the marks, and the identified applications for registration and registrations thereof.

R4 Vascular, Inc

_____

By:

Its:

# SCHEDULE A

| Trademark | Description | Serial Number | Filing Date | Registrant |
|---|---|---|---|---|
| r4 Vascular | Corporate Logo | 77/095501 | 01/31/07 | r4 Vascular |
| Pegasus | Pegasus CT PICC | 77/160,874 | 04/19/07 | r4 Vascular |
| Zeus | Zeus CT PICC | Not filed | | |
| DrainEx | DrainEx Drainage Catheter | Not filed | | |
| Pherocious | Pherocious Apheresis Catheter | Not filed | | |
| Zenergy | Zenergy CVC's and Ports | Not filed | | |
| Duraspan | Duraspan Long-term Hemodialysis Catheter | Not filed | | |
| Vector PTA | Vector PTA Balloon Catheter | Not filed | | |

Exhibit E

Form of Assumption Agreement

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (the "*Agreement*") is dated as of the ___th day of _____, 2013 (the "*Effective Date*"), R4 Vascular, Inc., a Delaware corporation with an address at 1270 Avenue of the Americas, Ste 302, New York, NY 10020, ("*Assignor*") and White Sand Beach, LLC, a Delaware limited liability company with an address at c/o Robinson Brog Leinwand Greene Genovese & Gluck P.C. 875 Third Avenue New York, NY 10022 ("*Assignee*" together with the Assignor the "*Parties*").

**NOW, THEREFORE,** in consideration of the foregoing and the covenants and agreements set forth below, the Parties hereto hereby agree as follows:

## SECTION 1.  CONTRIBUTION AND ASSUMPTION

1.1    Transfer.  The Assignor hereby assigns, transfers, conveys and delivers to the Assignee and the Assignee hereby accepts from the Assignor all of the Assignor's right, title and interest, if any, in the Agreements listed on Exhibit A (the "*Agreements*").  In exchange for the transfer and assignment of the Agreements, the Assignee has paid the Assignor the consideration described in the Asset Purchase Agreement, the terms of which are incorporated herein.

1.2    Assumption of Obligations.  The Assignee hereby assumes and agrees faithfully to perform and fulfill all the obligations now or hereinafter owed by the Assignor under the Agreements in accordance with their respective terms.

## SECTION 2.  GENERAL PROVISIONS.

2.1    No Waivers.  No party shall be deemed to waive any of its rights, powers or remedies hereunder unless such waiver is in writing and signed by said party.  No delay or omission by any party in exercising any of said rights, powers, or remedies shall operate as a waiver thereof.

{00634844.DOC;1 }

Nor shall a waiver signed by any party of any breach of the covenants, conditions, or agreements binding on the other party on one occasion be construed as a waiver or consent to such breach on any future occasion or a waiver of any other covenant, condition, or agreement herein contained.

2.2    Binding Agreement.  This Agreement shall be binding upon and inure to the benefit of, and are enforceable by, the Parties and their respective successors and permitted assigns.

2.3    Severability.  If any provision of this Agreement is held or determined by a court (or other legal authority) of competent jurisdiction to be illegal, invalid, or unenforceable in any jurisdiction, the offending provision (a) shall be enforced to the fullest extent permitted in the jurisdiction and (b) shall be deemed separate, distinct and independent, and shall be ineffective to the extent of such holding or determination without (i) invalidating the remaining provisions of this Agreement in that jurisdiction or (ii) affecting the legality, validity or enforceability of such provision in any other jurisdiction.

2.4    Captions and Headings.  Captions and paragraph headings used in this Agreement are for convenience only and shall not be used to interpret any provision hereof.

2.5    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

2.6    Pronouns.  Pronouns used herein shall be construed as masculine, feminine, or neuter, and both singular and plural, as the context may require, and the term "person" shall include an individual, corporation, association, partnership, trust, and other organization.

2.7    Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same Agreement.

2.8    Further Assurances. From and after the date of this Agreement, each of the Parties shall, from time to time, at the request of the other Party and without further consideration, do, execute and deliver, cause to be done, executed and delivered, all such further acts, things and instruments as may be reasonably requested or required more effectively to evidence and give effect to the transactions contemplated by this Agreement.

IN WITNESS WHEREOF, the Parties have caused their duly authorized representative to execute this Agreement the day and year first above written.

R4 Vascular, Inc

_____

By:
Its:

White Sand Beach LLC

_____

By:
Its:

## EXHIBIT A

1. Master Agreement, July 9, 2008, Grand Avenue Software, Inc.
2. Quickbooks Enterprise Solutions License and Support, Renewal date June 22, 2013.
3. MozyPro (no written agreement. Service is billed annually and paid by credit card)
4. Agreement for Calibration Services, Palen/Kimball LLC, June 28, 2012
5. Blue Cross Blue Shield of Minnesota

Exhibit F

Form of Bid Procedures Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                            Chapter 11

**r4 VASCULAR, INC.,**                            Case No. 13-12409 (SCC)

                          Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### ORDER PURSUANT TO SECTIONS 105, 363, 365, 503 AND 507 OF THE BANKRUPTCY CODE (I) APPROVING BID AND AUCTION PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (II) APPROVING THE FORM AND MANNER OF NOTICE OF THE AUCTION; AND (III) DIRECTING COUNTERPARTIES TO CONTRACTS TO OBJECT TO THE DEBTOR'S PROPOSED COSTS TO CURE DEFAULTS WITH RESPECT THERETO

Upon the motion and exhibits thereto (the "Motion") of r4 Vascular, Inc., as debtor and

debtor in possession (the "Debtor"), dated July 30, 2013, seeking entry of an Order of this Court

(A) authorizing the Debtor to sell assets free and clear of all liens, claims, encumbrances and

interests pursuant to 11 U.S.C. § 363(b) and (f); (B) assumption and assignment of certain

executory contracts; (C) approving bidding and sale procedures; and (D) granting related relief;

and it appearing that due notice of the Motion and the relief requested therein has been properly

provided to (i) White Sand Beach, LLC (the "Purchaser") secured creditor of the Debtor; (ii) the

Office of the United States Trustee; (iii) the Debtor's twenty largest unsecured creditors; (iv)

parties to executory contracts listed on Exhibit D to the Debtor's Motion; and (v) other parties

having appeared in this case and requested notices or otherwise having any interest in the assets

being sold pursuant to the Motion (collectively, the "Noticed Parties"); and no other or further

notice of the relief requested in the Motion and provided herein need be given; and upon the

hearing on the relief sought in the Motion; and the appearances of all parties in interest having been duly noted in the record; and after due deliberation, sufficient cause appearing therefor; and

**SUBJECT TO THE FURTHER PROVISIONS OF THIS ORDER, THIS COURT FINDS THAT:**

A.    On July 24, 2013 (the "Filing Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor is continuing to operate its businesses and manage its properties as debtor-in-possession. To date, no creditors' committee has been appointed herein pursuant to section 1102 of the Bankruptcy Code.

B.    On July 30, 2013, the Debtor filed with this Court the Motion seeking approval of, among other things, certain bid procedures as more fully set-forth therein. The bid procedures relate to the sale by the Debtor of substantially all of its assets and the assumption and assignment of certain executory contracts (the "Sale") under an Asset Purchase Agreement dated as of July 25, 2013 (the "Purchase Agreement" or the "APA"), by and between the Debtor, as seller, White Sand Beach LLC as Purchaser (the "Purchaser"), subject to higher or better offers. A copy of the Purchase Agreement is annexed to the Motion as Exhibit A.  The Purchase Agreement contemplates, among other things, certain bid procedures for purposes of acquiring the Debtor's assets, (collectively, the "Bid Procedures").

C.    The Debtor has articulated good and sufficient business justifications for approval of the Bid Procedures, and has exercised prudent and reasonable business judgment with respect thereto.

D.    The Bid Procedures as set-forth in Exhibit "A" attached hereto are the result of extensive good faith negotiations among the Debtor and the Purchaser.

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1.      The Bid Procedures, which are attached as Exhibit "A" hereto, are hereby approved.

2.      The Bid Procedures shall govern all processes and proceedings relating to the submission, consideration and acceptance of competing bids for the Assets (as defined in the Purchase Agreement) and are hereby incorporated herein by reference.

3.      Notice of the Bid Procedures and the Auction as provided herein shall be good and sufficient, and no other or further notice of the relief requested in the Motion pertaining thereto if, within two (2) business days after entry of this Order, the Debtor serves a copy of this Order and Exhibit "B" by first class mail, postage prepaid, upon (i) the Noticed Parties including any other person known to the Debtor to assert an interest in the Assets ; (ii) all persons or entities that have expressed an interest in purchasing the Assets during the last six months preceding entry of this Order and (iii) all persons or entities who have filed a notice of appearance in this case.

4.      The form of *Notice of Auction* annexed hereto as Exhibit "B" is approved. The Debtor shall serve a copy of this Order and the notice in the form annexed hereto as Exhibit "B" upon all parties originally served with the Motion, within two (2) business days of entry of this Order. The Debtor shall publish the Notice of Auction in the (i) _____; and (ii) _____, no later than _____.

5.      The Purchaser is approved as the "stalking horse" bidder for the purchase of the Assets and in the event the Purchaser is not the successful bidder at the Auction, the Purchaser shall be entitled to a $100,000 break-up fee plus up to $25,000 of reimbursement of reasonable expenses, including attorneys fees, associated with Purchaser's negotiation of the

APA, participation in this Bankruptcy Case and other costs associated with the sale of the Assets. The Purchaser's bid for the Assets (including the assumption and assignment of the Included Contracts and the Assumed Liabilities (as defined in the Purchase Agreement)) shall be the floor bid against which any and all other bids shall be considered by the Debtor and this Court.

6.    In the event competing bids for the Assets are received in accordance with the bid procedures established herein, then the Auction shall be held on **September 25, 2013 at 10:00 a.m.** at the offices of Debtor's counsel, Law Offices Of Scott A. Steinberg, 626 RXR Plaza, West Tower, Uniondale, New York 11556.

7.    The hearing on approval of the sale of the Assets pursuant to the Purchase Agreement, shall be held on **October 1, 2013 at 10:00 o'clock in the forenoon of that date (EST)**, unless otherwise continued or adjourned (the "Sale Hearing") in the Courtroom of the Hon. Shelley C. Chapman, United States Bankruptcy Judge, United States Bankruptcy Court, Alexander Hamilton Customs House, One Bowling Green, New York, New York 10004.

8.    Any party objecting to the Sale must file a written objection setting forth the facts and authorities upon which it relies for its objection in the Office of the Clerk of the United States Bankruptcy Court, United States Courthouse, Alexander Hamilton Customs House, One Bowling Greene, New York, New York 10004, **no later than 5:00 p.m. (EST) on September 26, 2013** (the "Sale Hearing Objection Deadline"), with a copy to Chambers, and must serve a copy of any objection to the Sale Hearing on (i) the Law Offices of Scott A. Steinberg, 626 RXR Plaza, West Tower, Uniondale, New York 11556, counsel to the Debtor, (ii) Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, New York, New York 10022, Attn: A. Mitchell Greene, Esq., counsel to the Purchaser, and (iii) Office of United

States Trustee for the Southern District of New York, 201 Varick Street, Room 1006, New York, New York 10014 so that it is received no later than the Sale Hearing Objection Deadline.

9.    Any Parties to Included Contracts shall be required, no later than the Sale Objection Hearing Deadline, to file written objections, setting forth the facts and authorities upon which they rely, of any objection to the Debtor's proposed assumption and assignment of any Included Contracts (as defined in the APA), including but not limited to the Debtor's proposed costs to cure (as provided in Exhibit D to the Motion). Failure to object shall be deemed to be consent to the assumption and assignment of such Included Contract without any further adequate assurance of prompt cure or future performance and the costs to cure such executory contracts pursuant to 11 U.S.C. § 365.

10.    This Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.


Dated: New York, New York
    \_\_\_ , 2013

          _____
          UNITED STATES BANKRUPTCY JUDGE

## Exhibit "A" --Bid Procedures and Buyer Protections

(a)    The public auction sale of the Assets (including the assumption and assignment of certain executory contracts) to White Sand Beach LLC (the "Purchaser") or another potential bidder as set forth in the Asset Purchase Agreement dated July 25, 2013, which is annexed to the Application as Exhibit "A" (the "APA" or the "Purchase Agreement"), will be conducted at the **Law Offices Of Scott A. Steinberg**, 626 RXR Plaza, West Tower, Uniondale, New York 11556 **commencing at 10:00 a.m. (EST) on September 25, 2013,** upon the terms and conditions set forth herein (the "Public Auction Sale");

(b)    To be considered by the Debtor and this Court, an offer to purchase the Assets must be a qualified competing bid ("Qualified Competing Bid") made by a qualified competing bidder ("Qualified Competing Bidder"), as provided herein;

(c)    A Qualified Competing Bid shall consist of a timely offer for the purchase of the Assets made by a Qualified Competing Bidder, in accordance with the terms hereof, and accompanied by a deposit as provided for herein;

(d)    An offer for the purchase of the Assets that is submitted by a party which the Debtor reasonably believes to be financially able and interested in consummating a purchase of the Assets shall be deemed a Qualified Competing Bidder;

(e)    Each offer must be served upon counsel for Debtor, the Law Offices of Scott A. Steinberg, 626 RXR Plaza, West Tower, Uniondale, New York 11556, and counsel for the White Sand, Robinson Brog Leinwand Greene Genovese & Gluck PC, 875 Third Avenue, New York, New York 10022, Attn: A. Mitchell Greene, Esq., **no later than 5:00 p.m. on September 22, 2013**; and must be accompanied by evidence satisfactory to the Debtor of the

willingness and financial ability of the Qualified Competing Bidder to consummate the transaction to be deemed a Qualified Competing Bid;

(f)     The Purchaser shall be deemed to be a Qualified Competing Bidder;

(g)     Each Qualified Competing Bid must be served upon counsel for Debtor, the Law Offices of Scott A. Steinberg, 626 RXR Plaza, West Tower, Uniondale, New York 11556, and counsel for the Purchaser, Robinson Brog Leinwand Greene Genovese & Gluck PC, 875 Third Avenue, New York, New York 10022, Attn: A. Mitchell Greene, Esq., so as to be received no later than three (3) business days prior to the Public Auction Sale of the Assets; *provided, however,* that the Debtor, in its sole discretion, may waive compliance with this paragraph;

(h)     Each Qualified Competing Bidder (other than Purchaser)  making a Qualified Competing Bid must deliver to counsel for Debtor, the Law Offices of Scott A. Steinberg, 626 RXR Plaza, West Tower, Uniondale, New York 11556 at the time of making such Qualified Competing Bid, a deposit in cash in an amount equal to at least ten (10%) percent of its Qualified Bid (a "Deposit");

(i)     Deposits shall be made in immediately available funds (cashier's check, certified check, irrevocable letter of credit, or cash);

(j)     If a Qualified Competing Bidder becomes the purchaser of the Assets, its Deposit shall be deemed to be non-refundable and shall be forfeited to the Debtor if such Purchaser fails to close for any reason other than a material breach by the Debtor of the APA;

(k)     If a Qualified Competing Bidder does not become the purchaser of the Assets, its Deposit shall be returned to it within the earlier of (i) three business days after the Debtor's closing of a sale of the

Assets to Purchaser; or (ii) 30 day's after the date of the Public Auction Sale;

(l)    A Qualified Competing Bid must contain an offer to purchase all of the Assets to be purchased and to assume all Included Contracts under the APA and assume and perform all of the obligations and liabilities that the Purchaser (as defined in the APA) is required to assume and perform under the Purchase Agreement; p*rovided, however,* that the Debtor, in its sole discretion may waive compliance with this paragraph;

(m)    A Qualified Competing Bid must contain terms and conditions no less favorable to the Debtor's estate than those terms and conditions contained herein and in the offer of Purchaser as set forth in the APA;

(n)    A Qualified Competing Bid must not be contingent upon either financing or the conduct or results of any due diligence investigation;

(o)    The Debtor, in the exercise of its discretion may adjourn the Public Auction Sale on the record on the date of the Public Auction Sale if the Debtor believes that a higher or better offer may be made by a potential purchaser upon the completion of due diligence that has not, as of the date of the Public Auction Sale, been completed;

(p)    At the Debtor's sole reasonable discretion the Debtor may treat as waived and revoked any Qualified Competing Bid made by any Qualified Competing Bidder (other than Purchaser) who does not attend the Public Auction Sale;

(q)    At the time and place of the Public Auction Sale, if no Qualified Competing Bid has been timely submitted that constitutes a higher and better offer for the Assets than the Purchaser's offer contained in the APA, the Debtor may approve the Purchaser's offer contained in the APA, in which event Purchaser shall be deemed to be the purchaser of the Assets; subject, however, to the Court

subsequently granting approval of the Debtor's motion for authority to enter into the transaction under 11 U.S.C §§ 363 and 365  and the Purchaser performing its obligations under the Purchase Agreement and the satisfaction or waiver of the conditions to closing contained in the APA;

(r)    At the time and place of the Public Auction Sale, if one or more Qualified Competing Bids have been timely submitted that constitute a higher and better offer for the Assets than the Purchaser's offer as determined by the Debtor, and neither Purchaser, nor any other Qualified Competing Bidder, wishes to submit a revised, higher and better bid on the record, the Debtor may accept the highest and best Qualified Competing Bid and the bidder submitting the best Qualified Competing Bid shall be deemed to be the purchaser of the Assets; subject, however, to the Court subsequently granting approval of the Debtor's motion for authority to enter into the transaction under 11 U.S.C §§ 363 and 365 and the satisfaction or waiver of the conditions to closing contained in the APA;

(s)    At the time and place of the Public Auction Sale if one or more Qualified Competing Bids have been timely submitted that constitute a higher and better offer for the Assets than the Purchaser's offer as determined by the Debtor after consultation with the Purchaser, the Debtor shall conduct an auction among Purchaser and any Qualified Competing Bidder or Bidders that has or have submitted a Qualified Competing Bid or Bids;

(t)    The minimum opening bid at the Public Auction Sale shall be in the amount of the highest and best Qualified Competing Bid in excess of the Purchaser's offer submitted to the Debtor in accordance with the terms hereof, which minimum opening bid shall not be less than $6,250,000 in cash;

(u)    Subsequent bids made on the record at the Public Auction Sale shall be in minimum increments of $25,000;

(v)     At such time as it appears to the Debtor in the exercise of its reasonable discretion, that neither Purchaser nor any Qualified Competing Bidder present at the Public Auction Sale is prepared to advance the bidding, the Debtor shall (after giving fair warning, on the record, to those entities and persons present) close the bidding on the record and the entity or person which immediately prior to the close of the bidding shall have submitted the highest and best offer for the purchase of the Assets shall be declared the purchaser of the Assets as determined by the Debtor in the exercise of its business judgment after consultation with the Purchaser, subject to an order of this Court approving the sale and execution and delivery of a purchase agreement substantially in the form of the purchase agreement with changes to reflect the offer and the satisfaction or waiver of the conditions to closing contained in the APA; and

(w)     In the event that the purchaser of the Assets is an entity or person other than Purchaser, then such purchaser shall be bound by all of the terms of the APA (as such terms, including those with respect to the purchase price, shall have been modified by the terms of such purchaser's winning bid) and the Debtor shall be obligated to pay Purchaser a "break up" fee in the amount of $100,000 plus reimbursement of Purchaser's reasonable expenses associated with the negotiation and unconsummated purchase of the Assets.

# Exhibit B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

In Re:

**r4 VASCULAR, INC.**

                  Debtor.

-------------------------------------------------------X

Chapter 11
Case No.  13 – 12409 (SCC)

## NOTICE OF AUCTION AND SALE HEARING
## AND OBJECTION DEADLINES

      **PLEASE TAKE NOTICE,** in accordance with the *Order Pursuant to Sections 105, 363, 365 503 and 507 of the Bankruptcy Code Approving (I) Bid and Auction Procedures for the Sale of Certain Assets; (II) Assumption and Assignment of Certain Executory Contracts; and (III) the Form and Manner of Notice of the Auction,* approved by the United States Bankruptcy Court for the Southern District of New York (the "Court") on _____, 2013, **r4 Vascular, Inc.,** debtor and debtor in possession (the "Debtor") in the above-captioned case, will conduct an Auction of certain of the Debtor's assets, more particularly described in the Asset Purchase Agreement (the "APA"), by and among the Debtor as Seller, and White sand Beach LLC. as Purchaser (the "Proposed Purchaser") dated July 25, 2013, as described herein.

      <u>**The Sale.**</u> On **October 1, 2013 at 10:00 A.M.** a Hearing will be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, One Bowling Green, New York, New York 10004, seeking approval of the sale of the assets pursuant to the APA.

      <u>**Objections To The Sale Of Assets**</u>  Any objections to the sale of the assets must be in writing; conform to the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules of the United States Bankruptcy Court, Southern District of New York; set forth the name of the Objector; set forth the nature and the amount of the objector's claims or interests in the Debtor's estate or property; state the legal and factual basis for the objection and the specific grounds therefor; be filed with the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, on or before 5:00 P.M. (EST) on September 26, 2013; and be served so as to be received (i) the Law Offices of Scott A. Steinberg, 626 RXR Plaza, West Tower, Uniondale, New York

11556, proposed counsel for the Debtor, (iii) Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, New York, New York 10022, Attn: A. Mitchell Greene, Esq., counsel to the Purchaser, and (iv) Office of United States Trustee for the Southern District of New York, 201 Varick Street, Room 1006, New York, New York 10014, with a courtesy copy to Chambers of the Honorable Shelley C. Chapman, United States Bankruptcy Judge, United States Bankruptcy Court, Alexander Hamilton Customs House, One Bowling Green, New York, New York 10004.

**The Auction**  The Debtor will conduct an Auction for the Assets as defined in the APA on **September 25, 2013 at 10:00 A.M.** at the Law Offices Of Scott A. Steinberg, 626 RXR Plaza, West Tower, Uniondale, New York 11556.. All interested parties are invited to pre-qualify for the Auction and present competing offers for the assets **no later than 5:00 p.m. on September 22, 2013** in compliance with the bidding procedures (as hereinafter defined).

**The Bidding Procedures**  Consideration of competing offers and attendance and participation at the Auction is subject to terms, conditions and procedures described in the Bidding Procedures Order (collectively, the "Bidding Procedures"). The Bidding Procedures are described in more detail in the Bidding Procedures Order entered by the Court on _____ 2013, which is available upon request made to Scott Steinberg, Esq. Law Offices of Scott A. Steinberg, 626 RXR Plaza, West Tower, Uniondale, New York 11556, proposed counsel for the Debtor.

Copies of the Procedures Order, the APA and the Sale Motion seeking approval of same are available from the undersigned counsel for the Debtor upon written request.

**DATED:**        2013

**LAW OFFICES OF SCOTT A. STEINBERG**
*Proposed Counsel to the Debtor*

By:_____
       **Scott A. Steinberg**
626 RXR Plaza, West Tower,
Uniondale, New York 11556
Tel: 516-522-2566
ssteinberg@saslawfirm.net

## BILL OF SALE

WHEREAS, R4 Vascular, Inc., (the "*Seller*") and White Sand Beach, LLC ("*Buyer*") have entered into an Asset Purchase Agreement, dated as of July 25, 2013 (the "*Agreement*"), pursuant to which Seller has agreed to sell to Buyer, and Buyer has agreed to purchase from Seller the "*Acquired Assets*", as defined in the Agreement.

NOW, THEREFORE, Seller, for good and valuable consideration paid to it, and pursuant to the provisions of the Agreement, which are hereby incorporated by reference herein, has granted, bargained, sold, conveyed, assigned, released, transferred and delivered, and by these presents does grant, bargain, sell, convey, assign, release, transfer and deliver unto Buyer, its successors and assigns, to have and hold the same forever, the Acquired Assets.

Seller, for itself and its successors and assigns, does warrant to Buyer and its successors and assigns, that Seller is the sole owner of the Acquired Assets and has not heretofore sold, transferred or conveyed the Acquired Assets to any other party, and that Seller does hereby convey to Buyer good and marketable title to the Acquired Assets free and clear of all liens, liabilities, claims and encumbrances, and does for its successors and assigns covenant and agree to warrant and defend the sale of the Acquired Assets to Buyer, its successors and assigns, against all and every person.

IN WITNESS WHEREOF, Seller has executed this instrument as of the ____ day of _____, 2013, to become effective on the date hereof.

R4 Vascular, Inc.,

By:_____
Name:
Title:

{00634852.DOC;1 }                                1

Exhibit H

Seller's Disclosure Schedule

Schedule 1.01: Assigned Contracts:

1.    Master Agreement, July 9, 2008, Grand Avenue Software, Inc.

2.    Quickbooks Enterprise Solutions License and Support, Renewal date June 22, 2013.

3.    MozyPro (no written agreement. Service is billed annually and paid by credit card)

4.    Agreement for Calibration Services, Palen/Kimball LLC, June 28, 2012

5.    Blue Cross Blue Shield of Minnesota

Schedule 4.02: Consents: None

Schedule 4.03: Subsidiaries: None

Schedule 4.07: Environmental Matters: None

Schedule 4.08: Issues as to Title of the Acquired Assets: None

Schedule 4.10(c): Actions Taken since December 31, 2012: None

Schedule 4.11: Sufficiency of Assets: None

Schedule 4.12: Tangible Property and Equipment: None

Schedule 4.12: Legal Proceedings: None

Schedule 4.14(a): Compliance with Laws: None

Schedule 4.16(a)

i) Patents

     1. Issued patent #8,079,990 B2

     2. Pending application 12/610,102

ii) Trademarks

| Trademark | Description | Serial Number | Filing Date | Registrant |
|---|---|---|---|---|
| r4 Vascular | Corporate Logo | 77/095501 | 01/31/07 | r4 Vascular |
| Pegasus | Pegasus CT PICC | 77/160,874 | 04/19/07 | r4 Vascular |
| Zeus | Zeus CT PICC | Not filed | | |
| DrainEx | DrainEx Drainage Catheter | Not filed | | |
| Pherocious | Pherocious Apheresis Catheter | Not filed | | |
| Zenergy | Zenergy CVC's and Ports | Not filed | | |
| Duraspan | Duraspan Long-term Hemodialysis Catheter | Not filed | | |
| Vector PTA | Vector PTA Balloon Catheter | Not filed | | |

(iii) Registered Copyrights- None

(iv) Domain Names - r4vascular.com

Schedule 4.16(b)-

1. Grand Avenue Software, Master License Agreement, July 9, 2008. ( This is the r4 quality and regulatory compliance system.)

2. Mozy Inc. , MozyPro GB Service Storage (On line back-up of the r4 server.)

3. Intuit, Inc. Quickbooks Enterprise Solutions license and support agreement


Domain Name Services


Schedule 4.16(d)- Seller believes that C.R. Bard, Inc. violated the terms of a confidential non-disclosure agreement and misappropriated Seller's intellectual property rights in the design of Seller's PTA balloon.


Schedule 4.19(a)- Material Agreements

Blue Cross Blue Cross of MN

Centurion Medical Products, Inc.

Fast Forward Manufacturing, Inc.

Grand Avenue Software, Inc.

Greatbatch Ltd.

Healthline International Corp.

Liberty Property Trust

RR Donnelly Global Turnkey Solutions

Sterigenics, Inc.

Travelers Insurance

Via Biomedical, Inc.

{00632549.DOC;4 }

White Sand Beach LLC

Schedule 4.19(b)- None

**EXHIBIT "D"**

| **INCLUDED CONTRACT** | **CURE AMOUNT** |
|---|---|
| Grand Avenue Software, Inc. | $2,531.96 |
| Quickbooks Enterprise Solutions License | $0 |
| MozyPro | $0 |
| Palen/Kimball LLC | $0 |
| Blue Cross Blue Shield of Minnesota | $0 |
| Domain Services<br>c/o Necessity Online | $0 |